# WILCOX v. CLOWARD et al.

No. 5655. Decided March 26, 1936. (56 P. [2d] 1.)

504

505

*Christenson, Straw & Christenson,* of Provo, for appellant Cora Cloward.

*Anderson & Cannon,* of Salt Lake City, for appellant Deseret Bldg. Soc.

*Morgan & Morgan,* of Provo, for respondent Dean Wilcox.

*Joseph E. Nelson,* of Spanish Fork, for respondent, E. K. Ferguson.

WOLFE, Justice.

We believe that in this case a brief preliminary statement of the issues preceding the statement of facts will permit the reader to follow the statement of facts with a better idea of their significance. The suit involves a contest between the owner of a house, two mechanic's lien claimants, and a mortgagee. Cora Cloward, the owner of the house, claims a homestead exemption and contends that the lien claimants are not entitled to mechanic's liens because she claims (1) that notices of intention were filed too late, and (2) their actions to foreclose were brought too late. She also contests the right of the Deseret Building Society, the mortgagee,

hereinafter referred to as the building society, to recover judgment or to claim a lien because she maintains the money for which her note and mortgage were given was never paid to her nor to any one by her authority.

The lien claimant Wilcox contends that he is prior to the mortgagee because he claims his work was started before the mortgage was recorded. Both lien claimants Wilcox and Ferguson joined with Cora Cloward in contesting the right of the mortgagee to have a lien. On the other hand, the mortgagee joins with Cora Cloward in her claim that she has a homestead, for thus the lien claimants could not collect against the homestead, but the mortgagee, if it prevailed in its assertion that the mortgage was a good lien against the property, would not be subject to the homestead. See *Volker-Scowcroft Lumber Co.* v. *Vance,* 32 Utah 74, 88 P. 896, 125 Am. St. Rep. 828. The mortgagee also joins with Cora Cloward in her effort to prove the lien claimants too late in filing their notices of liens and in bringing their actions. It can thus be seen that each party in its endeavor to defeat the claims of the other will be standing sometimes with and sometimes against the others, depending upon where its interests lie on any particular issue.

With the claims of the parties roughly in mind, we may proceed to narrate the facts in order to see how they illuminate the issues. On May 12, 1930, Cora Cloward and the Pacific Building & Finance Company, a corporation, hereinafter in this opinion called the finance company, entered into a contract under the terms of which the former, as buyer, agreed to buy from the finance company, as builder, a house to be built according to certain plans and specifications for the sum of $2,790, $100 down, $550 when the contract was signed, $1,000 when the materials arrived, $500 when the building was up to the square, and the balance of said contract price when the building was completed. The contract further provided that, "It is mutually understood that a loan is to be arranged from the Deseret Building Society for the financing of the house and that the above

payments may be affected by the rules of said loan company." Miss Cloward paid $650 at the time of the signing of the contract. She paid nothing more on the contract.

On May 31, 1930, Miss Cloward signed a note for $1,800 in favor of the building society and executed a mortgage to secure its payment on the real estate on which the finance company agreed to build the home. She never dealt with any of the officers of the building society directly. The blank note and mortgage were brought to her by a Mr. Gease who was an officer in the finance company. These were executed by her and handed back to Gease. It was testified that either Mr. Gease or Mr. Pyper, both officers of the finance company, dealt with the building society in negotiating the loan. Cora Cloward never personally received any money from the building society, nor was it ever deposited in any bank in her name or on her behalf. Miss Cloward was absent from Salt Lake City from June 12th to the middle of August, sojourning in St. Louis. During her absence and after her return there was advanced to the finance company by the building society a total sum of $1,786 in three payments, as follows: June 16, 1930, $500; July 29, 1930, $400; September 15, 1930, $846; and September 15, 1930, $40.

On June 2, 1930, Dean Wilcox, the plaintiff, and the finance company, as the original contractor, entered into a contract to have Wilcox do the excavation and cement work, the carpenter work, the plastering, and the lathing. On August 7, 1930, E. K. Ferguson, intervener and respondent, entered into a contract with the finance company to install the plumbing and heating fixtures and to construct the cesspool.

There is no dispute as to the above facts. On these facts and others in regard to which there was conflicting testimony, which we shall later recite, the court found as follows: That the reasonable value of the labor and materials furnished by Wilcox, the plaintiff, was $1,059.68; that he was entitled to a first lien ahead of the mortgagee for that

amount, plus interest at the rate of 8 per cent from the 11th day of November, 1930, in the sum of $280, and $2.60 for preparing and recording notice of intention of claiming mechanic's lien; $16.40 for moneys expended for publishing notice of lienholder's claim; and $25 attorney's fee; making a total of $1,383.88 in favor of Wilcox. The court found that there was no authority given to the building society for turning the money for which the Cloward note and mortgage were given as security to the finance company, but adjudged the building society to have a second lien subsequent to the Wilcox lien for $774.97, together with interest from the 10th day of February, 1932, amounting to $127.43, and $100 attorney's fees, or a total of $1,042.40. We shall later discuss the theory upon which the court arrived at this figure. Even upon the court's theory, there are evidently some arithmetical errors in the calculation.

The court gave judgment that Ferguson have a lien subsequent to that of the building society for $229.75 with interest thereon from the 6th day of December, 1930, of $59.73, and $25 attorney's fee, or a total of $314.48. The finance company defaulted upon a stipulation that no deficiency judgment be taken against it. There is also a stipulation that no judgment should be taken against the defendants Pyper, Gease, Page, and Morris. The Provo Brick & Tile Company and the Bonneville Lumber Company did not appear at the trial, but no proof to support any judgment against them was introduced. No findings of fact, conclusions of law, or judgment appear in respect to those two companies.

Miss Cloward appealed from the judgment in favor of Dean Wilcox against her and from the judgment in favor of the building society against her and from the judgment in favor of Ferguson against her. The building society appealed from the judgment in favor of Dean Wilcox making him prior to it and from the judgment in its favor against Cora Cloward on the ground that the judgment was insufficient. It also appealed from the judgment in favor of Fergu-

son against Miss Cloward. Since the judgment in favor of Ferguson gave him a lien subsequent to the building society, it is difficult to see how it was harmed by that judgment.

The first dispute as to the facts arises as to when Wilcox began work. He testified that there were stakes put on the premises on the 4th of June, 1930, and that he began excavating on the 5th of June. Spencer Banks testified that he worked under the direction of Wilcox and that he commenced work on June 5th. The building society mortgage was recorded on June 6th. There is no evidence that Wilcox knew at the time he started work that there was a mortgage executed and the court found that he did not know. Miss Cloward testified that when she left Salt Lake for St. Louis on June 12th there were no stakes set nor any excavation work begun. Mrs. Arminta Watters, a sister of Miss Cloward, testified that no stakes had been set or work done before the 4th of July, but seemed uncertain as to why she knew that. The court found that the plaintiff performed the first of the labor on the 4th day of June, 1930, and performed the last of his labor on November 11, 1930.

In an equity case it has been the rule of this court not to disturb a finding of the lower court on contested or conflicting evidence unless the evidence clearly preponderates against the conclusion of finding. In a sense, the witnesses as to the time when work began were all interested. The court had a chance to observe their demeanor while on the stand. The finding of the court that the work of Wilcox was begun before the 6th day of June will therefore not be disturbed.

Another conclusion of the court stands in the same category. We refer to the matter of homestead. Cora Cloward claimed a homestead because for twelve years her unmarried sister, Pearl, had lived with her and kept house while she taught school and had lived in this home from the time that Cora moved into it, between the 12th and 19th of September. Section 2905, Comp. Laws Utah

1917, in effect when this home was built, provides, as far as material here, as follows:

"The phrase 'head of a family' as used in this title includes within its meaning: * * *

"2. Every person who is (has) residing on the premises with him or her and under his or her care and maintenance, either: (a) his or her child, or the child of his or her deceased wife or husband, whether by birth or adoption; (b) a minor brother or sister, or the minor child of a deceased brother or sister; (c) a father, mother, grandfather, or grandmother; (d) the father, mother, grandfather, or grandmother of a deceased husband or wife; (e) an unmarried sister, or any other of the relatives mentioned in this section, who have attained the age of majority and *are unable to take care of or support themselves.*" (Italics supplied.)

It will be noted that for one to be the head of a family where the family is constituted by such claimed head and an unmarried sister, there must concur with the element of care and maintenance and residence on the premises claimed as a homestead, one other element not required in the case of the persons named in subsection 2, (a), (b), (c), and (d), to wit, the element that the unmarried adult sister must be unable to care for and support herself. The Revision of 1933 (section 38-0-5, subsec. 2) did not require this element, but this case arose before that revision. There was testimony in the case on the part of Miss Cloward, Mrs. Watters, a married sister, and Pearl Cloward, the unmarried sister, that Pearl was sickly and had been since childhood days. She tired easily and was nervous and could not assume responsibility. It arose from children's diseases. She helped around the house, but could not assume heavy house work. She had never tried to get work away from her sister. There was no question under the evidence but that Cora supported Pearl and maintained her. Counsel for Cora contend that there was no evidence to the contrary on the point that Pearl was unable to care for and support herself. This is the pivotal point in this question of homestead. The court saw Pearl in the courtroom. It was better able to judge

from seeing her whether she was able to care for herself than we would be from reading the record. In such a matter the inspection of such a person is doubly valuable. She never had supported herself, but, on the other hand, the testimony was that she never tried. The court, in spite of the testimony of the three sisters, who either had a direct interest in the result of the suit or had the interest of a close relative, could best judge of their credibility and from the appearance and demeanor of Pearl whether she was able to support and care for herself. We cannot say, moreover, that the court was wrong if it concluded that if Pearl could do as much as she had done in keeping house for Cora, that it might be concluded that she could earn her support doing the same for others. We cannot disturb the finding that Cora was not the head of a family as defined by section 2905, supra, when the family is alleged to be constituted by herself and her unmarried sister. The dissenting opinion fears this opinion will "disrupt this household" and will add "one more element of hardship and dependency." We, of course, do not intend to pass on any question of domestic relations. The sisters may live together as always. Nor does this decision add one iota of additional hardship to Pearl or Cora. It results in Cora simply paying what she agreed to pay for the home she got. She pays not one cent more or less. If she were allowed a homestead exemption, it would mean that the men who furnished the labor and materials would have built the home to that extent for her without being remunerated. If social results of the court's finding on the homestead contention were to be made the test, everything would be in favor of denying the homestead right. There being no homestead exemption, it results up to this point that the lien of Wilcox, if he has one, is not subject to such exemption and is ahead of the mortgage. Whether he has a lien depends upon whether his notice of intention was filed in time. The materials and labor were all furnished before the amendment of 1931 and the statute theretofore provided that subcontractors must file their notice of intention to

claim a lien within forty days after the performance of the last labor or the furnishing of the last materials. Wilcox recorded his notice on December 2, 1930. Therefore, his last labor or last materials furnished would have to be on the 23d day of October or later. Miss Cloward and the building society claim there was nothing done after October 1st except trivial or minor adjustments or repairs. There was conflicting evidence as to the time when certain jobs were done, as to whether some were done at all, and as to what was their nature and extent. Wilcox contended that some things were done on the request of Miss Cloward. There was a conflict as to whether they constituted work required under the original contract. In order to determine these questions, the evidence on all the work claimed to be done by Wilcox after October 1st must be carefully examined.

Wilcox testified that his last work before October 6th was in September, in which month he had men working twelve days on the building. In August he worked men ten days on the job. In October he worked only himself and as follows: On October 6th he fixed locks and checked up for defects; on October 9th he changed a door and did a few things that had not been done on the contract; on October 20th he fixed screen doors, a back door, and a platform; on November 1st he cut some wires which had been used in connection with wiring the cement forms together, which wires protruded from the wall; on the same date he cemented between the sill and the cement wall, making it tight. He paid for the cement and made no charge for that work. On November 11th he put 100 tin shingles under the wooden shingles where they leaked and put flashing around the chimney. He paid $5 for the shingles, but made no charge for the same. His contract had included putting on the roof.

Miss Cloward denied that he had done any work after October 1st except to fix a valley in the roof which a neighbor had punctured with a hatchet while chopping off ice. Here again we have a conflict of testimony. Wilcox stated

that all his dates had been put down a week before the trial after three years and were from recollection. Miss Cloward moved in the house some time between the 12th and 19th of September. Her testimony was that all these things had been done before October 1st, except that she denied that he had put in tin shingles on the roof.

Under the familiar rule that the lower court is best able to judge what the facts are under a fairly balanced conflict of evidence, we will not disturb its finding that the last work was done by Wilcox on November 11th. As to whether the work done after October 23d was of a sort to extend the time for the filing of his notice will be considered later. Since the same legal principles control in determining whether the work these two lien claimants claim to have done was a substantial continuation of the work on the contract or a minor or trivial adjustment or the remedying of trivial imperfections, it will conduce to brevity to consider that matter at one time in respect to the claims of both lien claimants.

Ferguson's first work on his contract with the finance company was on August 11th. He filed his notice of intention on December 30th. Therefore his last work done or materials furnished in order to make his notice good must have been on November 20, 1930, or later. He testified that his contract included digging two cesspools, installing complete sets of bath, lavatory, and sink fixtures and a hot water tank. He claimed his last work was done December 6, 1930, when he installed a range boiler and laundry tubs. From the evidence, it is not clear that the laundry tubs were part of the contract with the finance company. On November 20th he put permanent taps on the kitchen pipes. Much evidence was given of other small jobs done from September 26th, when he testified he installed the bath tub, to November 20th, but as these are before the necessary period in which the last-mentioned work must be done or materials furnished, such testimony was of value only in proving that

the jobs were a continuation of work required under his contract—only of value as connecting links.

Miss Cloward testified that the work Ferguson said he last did on December 6th, that is connecting the hot water tank and the laundry tubs, was done between September 27th and October 1st. She claimed nothing was done after October 1st by Ferguson except an exchange of toilet lids. Here again we have a conflict of testimony which the lower court resolved in favor of the lien claimant. We cannot disturb the finding of the court in this regard.

The next question pertains to whether the jobs done by these lien claimants were done in good faith as a part of their contract or were minor repairs and adjustments stimulated by a desire and for the purpose of extending the time for filing notices of intention. In the case of *Cahoon* v. *Fortune Min. & Mill. Co.*, 26 Utah 86, 72 P. 437, it was quite obvious that the last material furnished was not in pursuance of a line of natural and reasonable fulfillment of an obligation under the contract, but was a trumped up and fictitious delivery under a pretended fulfillment for the purpose of extending the time for filing notice of intention. Trivial or minor adjustments made casually or long after the main work is completed cannot be used to tie on to as the last labor done or materials furnished. Especially is this true if they are made for that purpose. But even small jobs where bona fide made to complete a contract which the claimant had the duty to complete, if not made too long after the main work is completed, especially if a part of a chain of similar or larger tasks performed in the process of finishing up or tapering off, will be sufficient to extend the time for filing the notice of lien. In the instant case, the main part of the contract of both Wilcox and Ferguson was finished before October 1, 1930. What was done afterward was *comparatively* minor. That is not equivalent to saying that they were in the nature of remedying trivial imperfections. In several of the states a mechanic's lien law does not permit subcontractors to file their notices until the

main contract is completed, and then requires them to be filed within a certain time after completion. In several of those states it is provided that the main contract shall not be considered as incomplete because of "trivial imperfections." This was for the benefit of the lien claimant so that he would not be delayed because there were still trivial imperfections to remedy. The test of trivial imperfections was said to be as follows: "Are the imperfections in the performance of the work so trivial in character as to permit the contractor to recover for substantial performance?" If the same test were applied to the things done by Wilcox on November 11th and those things done by Ferguson on December 6th, could it be said that if they were not done that the omission to do them was such as would enable Miss Cloward to successfully defend a suit for payment on the ground that the contract had not been fully performed? Certainly, a leaky roof needing a hundred shingles to repair it can hardly be said to be such a roof as is required to be accepted. Likewise, a plumbing contract where the range boiler still needed to be connected seems to be such an omission as to permit an owner successfully to resist payment until it was performed. There is no definite evidence that these tasks were delayed for the purpose of extending the time for filing notices. At least the court did not so find and was justified under the evidence in not so finding.

The following instances show what sort of work has been considered as still within the purview of the claimant's contract so as to extend the time for filing the notice of lien: Cleaning up of debris on the completion of a building. *Foster* v. *Brickbank*, (1915) 22 Dom. L. R. 38, 8 West. Wkly. 464. Putting in more and heavier wires where the reasonable value of this work was $261.61 as compared to a total contract price of $13,500 for the building and where it was required as a condition of issuance of a final inspector's certificate by the city electrician's office. *Hammond Lumber Co.* v. *Barth Inv. Corporation*, 202 Cal. 606, 262 P. 31. A flight of marble steps. *Bianchi* v. *Hughes*, 124 Cal. 24, 56

P. 610. A second coat of paint. *Nicholson* v. *Auburn Gold Min. & Mill. Co.*, 6 Cal. App. 547, 92 P. 651. Putting in a building a certain grate mantle and tiling. *Lichty* v. *Houston Lumber Co.*, 39 Colo. 53, 88 P. 846. Additional appliances in an attempt to bring a mill up to capacity. *Pusey & Jones* v. *Pennsylvania Paper Mills* (C. C.) 173 F. 634. Supplying an elevator. *Coss* v. *MacDonough*, 111 Cal. 662, 44 P. 325. Alterations in heating plant to bring it up to specifications. *Whimster* v. *Crow's Nest Pass Coal Co.* (B. C.) 13 W. L. R. 621. In *Rose* v. *O'Reilly*, 138 Wash. 18, 244 P. 124, 125, it was held:

"Where it did not appear that the furnishing of labor * * * was deferred fraudulently merely for the purpose of extending the time for filing the lien, but was a necessary element of the performance of the contract, the lien should not fail."

In the case of *Stidger* v. *McPhee*, 15 Colo. App. 252, 62 P. 332, on the insistence of the owner, the contractor, long after it was admitted that the house was entirely finished except for changes demanded by the owner, replaced a pine screen door with an oak one and a paneled pantry door for a battened one. It was held that the time for filing notice of lien ran from the date the changes were made. *Curtis* v. *McCarthy*, 53 Colo. 284, 125 P. 109, seems to be a case quite similar to the case at bar. It was there held:

"Work done by the contractor, at the request of the owner's agent, in order to complete the contract, putting in a new sink to take the place of a defective one, and odds and ends of work not completed, is a continuation of the previous work done under the contract as regards time for filing the lien."

The element of work done at the owner's request has had considerable weight in working an extension of time. See note, 54 A. L. R. 988.

The shingles used by Wilcox on November 11th cost him $5 and were paid for by himself and not charged in his statement of lien or as a part of his contract. The work was by

518

way of repairing something which had been unsatisfactorily performed. It has been held, "where a contract to furnish materials is to be regarded as completed, a subsequent gratuitous furnishing of material in the nature of a substitution or replacement to remedy a defect in the material originally delivered, will not operate to extend the time within which to claim a mechanic's lien." Note, 54 A. L. R. 984, and authorities cited thereunder. The work of Wilcox on November 11th did not come under this category. The cases cited under the note are cases of material replaced. They are cases where articles have been shipped and found to have been broken or unsatisfactory and a substitution made. In the instant case the materials and labor to complete the roof as it should have been completed were necessary. It is not the case of replacing a few panes of glass broken in transit, but the case of work done to satisfactorily complete a contract. It can readily be seen that there is a marked distinction between permitting the time for filing a lien to date from the time a minor replacement of materials is made and the case where a contractor uses materials and labor in the matter of actually making satisfactory a job which otherwise might have been considered as being incomplete. In the one case the time for filing the lien may be extended if the matter of work and labor in so satisfactorily completing the job is not so trivial or minor that the failure to do it would still leave the contract substantially performed so that recovery might be had. In all the cases cited under the note in 54 A. L. R., the material was of trifling value to take the place of broken, damaged, mistaken, or defective materials furnished by the seller some time after the original materials had been delivered, without demand by an owner or inspector. If the same principle extends to labor done to remedy a defect as well as to substituted materials, it would have to be of a very minor or trivial sort, such as touching up work previously substantially completed. *In re Abbott-Gamble Co.*, 115 C. C. A. 367, 195 F. 465.

In the case of cementing between the cement wall and the upper part of the house which rested upon it, which was work done on November 1st, Wilcox testified that ■ Miss Cloward asked him to do it. This work was, therefore, done at the request of the owner. It was held in *Rieflin* v. *Grafton*, 63 Wash. 387, 115 P. 851, 852, that:

"The delivery of August 18th was made upon the demand of one of the owners of the property, for the purpose of correcting defects which he claimed existed. The good faith of the appellant in furnishing these items cannot be 'questioned. The time for filing the claim of lien had not then expired, and the material was not furnished for the purpose of prolonging the time for filing it, or for the purpose of renewing a right to a lien which had been lost by delay."

*Bradley* v. *Donovan-Pattison Realty Co.*, 84 Wash. 654, 147 P. 421; *Osten* v. *Curtis*, 133 Wash. 360, 233 P. 643; note, 54 A. L. R. 988.

Where materials are furnished or labor performed at the request of the owner to remedy defects, the question of bad faith on the part of the lien claimant is eliminated. Some of the cases rest their decisions on the ground of estoppel, stating that the owner is estopped from asserting that the contract had been completed when he himself required certain matters to be done. In this case it is not necessary to determine whether the principle that if the owner requested the work or materials to be done to remedy a defect, it would in all cases extend the time for filing the lien regardless of how minor or trivial was the labor done or materials furnished in order to make the requested repairs, because we believe that the finding of the trial court that the last work done by Wilcox and Ferguson and to which the forty days for filing notice of lien is tied is of a substantial nature.

It follows, therefore, that the findings of the court that Wilcox and Ferguson filed their notices of intention within time must be sustained. This conclusion is further supported by certain cases which have held that where there is a conflict in the evidence, not only the finding of the court

as to what work and when it was done will be accepted by the review court, but, further, that the lower courts finding the ultimate fact that the work was bona fide in a continuation of or by way of completion of the contract which the plaintiff was bound to perform will also be accepted by the review court. See *Foster* v. *Brickbank,* supra:

"Whether the items of work done after the date on which the appellant claimed the building was completed were 'trivial imperfections' was a matter of fact to be determined by the court."

*Willamette Steam Mills Co.* v. *Kremer,* 94 Cal. 205, 29 P. 633; *Stidger* v. *McPhee,* supra.

These cases held that the court's deduction that the work was done in good faith and that it was not a minor or trivial repair, and that it was something still necessary in the completion of the contract, must stand unless clearly erroneous.

The next question is, Were the suits to foreclose the liens brought in time? Laws of Utah 1931, chap. 5, require actions to enforce liens to be begun within twelve months from the completion of the original contract or suspension of work thereunder for a period of thirty days. This has substantially the same meaning as section 3740, Comp. Laws Utah 1917. Therefore, there is not presented in this case the question of whether a change in the remedy between the accrual of the lien and the time when the action was brought to enforce it affects the plaintiff's rights or any question as to under which statute it must be brought. Wilcox filed his action on November 20, 1931. The intervener, Ferguson, filed his complaint in intervention on December 17, 1931. The notice to lienholders of the action was first published November 25, 1931. Ferguson's notice of mechanic's lien was filed in the case on December 12, 1931.

We do not think that the holding implied in the findings of the lower court that the contract was either completed after November 20, 1930, or suspended for thirty days so as to include November 20, 1930, in said period of suspension

does violence to the evidence. In the first place, there were no plans or specifications introduced so it is impossible to tell exactly what would be required to complete the contract. Secondly, since there were no issues between Cora Cloward and the finance company it was impossible to determine from such evidence whether the contract was completed. In the third place, there is testimony, although denied, that Arnold, who had the contract for electrical fixtures, did work in respect to them as late as December 24, 1930. In the fourth place it is asserted by Miss Cloward in this action that the contract has never been completed and that she has had no opportunity to claim offsets or resist payment. In her first assignment of error she asserts, "The evidence clearly shows that said building never has been completed." Under this state of the record we are not prepared to say that the court was wrong in concluding that the actions of both lien claimants were brought in time.

This brings us to questions raised by the assignments of error of the building society: (1) Was the court right in postponing the building society's claim to that of the Wilcox claim? (2) Was it correct in giving the building society a lien for $774.97 with interest? As to the first question, we have already stated that we have felt bound to accept the finding of the lower court that Wilcox started work before the date of the recording of the mortgage to the building society, to wit, before June 6, 1930, and, further, that Wilcox had no actual notice of the mortgage before he started work.

Under the case of *United States Building & Loan Ass'n* v. *Midvale Home Finance Corporation*, 86 Utah 522, 46 P. (2d) 672, recently decided by this court, Ferguson would have been entitled to refer the commencement of his work back to the date when Wilcox began his, and thus have his lien declared equal with that of Wilcox. But Ferguson has not appealed nor cross-assigned any error in the court's ruling making his lien third. Therefore, such ruling of the court is not up for review.

The second question above propounded depends partly on whether the building society had authority to pay to the finance company the money, the repayment of which the Cloward note and mortgage were meant to secure. If so, Miss Cloward would be liable for the full amount paid by the building society on her behalf up to $1,800 with interest, regardless of whether or not it went into the building. If she did not so authorize it, either expressly or impliedly, and the building society paid it out to the finance company, then the former could recover, if it could recover at all, only that part of the money which it paid to the finance company and which actually went into the building. While the lower court did not specify on what theory it gave the building society a lien for $774.97, if its finding was correct, it would not make any difference upon what theory it arrived at its conclusion. We must presume that it did not arrive at its conclusion from subrogation because subrogation was not pleaded. The building society in its answer and cross-complaint asserted that it had a lien for all of the $1,800 and was not conceding that its rights depended upon being subrogated to the finance company for such recovery as the finance company might have had against Miss Cloward. Therefore, it did not plead subrogation. Had it pleaded subrogation as one of the bases of its right to recover, then Miss Cloward might have used against it under that theory all of the defenses which she would have had against the finance company.

We do not mean to hold that in all cases subrogation must be pleaded. Equity may use it as a solution of a case which comes before it. It may be that in some cases where a party has the right to recover, equity will employ the doctrine of subrogation regardless of whether it is pleaded. Subrogation is a remedy which equity employs in working out a solution of certain problems. But subrogation cannot be used by a court at the end of a case to work out a solution where none of the parties knew that such principle would be employed and where, if the parties had

known it, certain defenses or rights could have been asserted. In such case it must be pleaded so that the opposing parties may have an opportunity to come in and have adjudicated such rights as arise by virtue of the claim of subrogation. We must, therefore, conclude that the court came to its conclusion that the building society was entitled to a lien for only $774.97 not on the theory of subrogation, but on the theory of an equitable lien.

The court found that the building society had no authority to pay any of the money to the finance company. Having so concluded, it must have decided that the building society could not recover on its note and mortgage. But it must have further concluded that the building society was entitled to have impressed upon the building an equitable lien for such moneys as it advanced to the finance company which actually were expended on the building and for which Miss Cloward would have been responsible under her contract to pay $2,790 to the finance company upon completion of its contract. That is to say, the court concluded that Miss Cloward in any event should be responsible for the sum of $2,790, but that she was responsible for that amount of money provided it went into her home. Since she paid $650, she was still responsible for $2,140. Wilcox having reasonably expended in labor and materials $1,059.68 and having a first claim could recover his first out of the $2,140. This would leave $1,080.32. Out of this remainder Ferguson would be entitled to his $229.75. The court, therefore, concluded that the remainder of the contract price must be considered to have been expended by the finance company out of moneys advanced by the building society, and gave the building society a lien for that amount, less certain credits.

As an equitable solution of the problem, the theory of the court has much to sustain it and we are not prepared to impugn its correctness. The difficulty that we find is in the evidence. There is no evidence in the record of what the building actually cost. We know from the two lienholders' claims that at least $1,289.43 worth of materials and labor

went into the building. There is no evidence that the $650 paid by Miss Cloward went into the building. The finance company may have used it on other buildings. Most likely a view of the building would convince any one that it had cost more than $1,289.43, but we do not know that judicially. Therefore, we cannot see how the lower court could assume that the total reasonable cost of materials and labor which went into the building was at least $2,790 and thus make the calculation the way it apparently did.

Does any assignment of error touch this conclusion of the court arrived at in the fashion it did? Miss Cloward in her eighteenth and nineteenth assignments of error complains of the conclusions of law whereby the court concludes that the building society is entitled to judgment in the sum of $1,002.40 as not supported by the findings or the evidence since the $1,002.40 includes the $774.97, plus interest and attorney's fees. This is a direct attack upon the finding of the court that said sum is correct and opens up the question as to whether there is any evidence to support it. There being no evidence to support the finding that $852, less credits of $77.03, or a net of $774.97, was expended by the finance company from moneys advanced by the building society, such finding and the conclusion from it must fall even under the court's own theory. The court also allowed $100 attorney's fee to the building society. If it found that the building society was not entitled to recover on its note and mortgage, but only on the theory of an equitable lien, certainly an attorney's fee, which depended on that contract, could not be recovered. Therefore, assignments Nos. 18 and 19 are well taken, accepting the court's theory of solution.

It remains to determine whether the court was correct in its theory. This, as stated before, depends upon whether there is any evidence to support the court's finding that there was no authorization to the building society to pay the money to the finance company. There certainly was no evidence of any express authority. Was

there any evidence of implied authority? The note and mortgage were signed by Miss Cloward upon their being brought to her by Mr. Gease, an officer of the finance company, and were taken by Mr. Gease or Mr. Pyper to the building society and the loan negotiated. Cora Cloward left Spanish Fork for St. Louis on the 12th of June and did not return until the middle of August. She testified that she was anxious to have the home completed so she could use it when she commenced teaching school in Spanish Fork in September. She, moreover, must be presumed to know that her contract with the finance company called for $1,000 payment when the materials were delivered, $500 more when the building was up to the square, and the balance when the contract was completed. Desiring the contract to be completed by September 1st, knowing that she would be away for the major portion of that time, and knowing that it would take money to complete the contract, and knowing that the only money beside the $650 she paid would be coming from the building society under the loan which was to be negotiated, it is a fair inference that she expected this money to be paid by the building society as the work progressed.

Moreover, the evidence is that after she returned and saw the building she made some inquiry regarding the money and was told that they were having trouble about it. She still saw the building going along after she returned. If the court had inferred from all the circumstances that she must have recognized that the building could not have been going on without some money being advanced therefor, and she must have impliedly acquiesced in the advancement by the building society to the finance company, we are not prepared to say that such inference could be disturbed. On the other hand, there was evidence that she expected the money to be paid to the bank. It may be that, being unfamiliar with business transactions, she may have thought the building was being constructed on credit and understanding that they were having trouble with the loan, and that the money was

still forthcoming and would put it in the bank where she could check it out and have control over it. We cannot say that the court was wrong in making the inference that it did that she had given no authority for the building society to pay the money to the finance company. Where two or more inferences may be drawn even from uncontradicted evidence, it is still a matter for the fact finder. Such is not the case where the facts are not disputed and only one inference may be made. In that case it would be incumbent upon the court to apply the law to the uncontested fact and in a jury trial direct a verdict.

The building society cites us to certain cases where it was held that a person who employs another to borrow money makes the person whom he employs his agent and not the agent of the lender and that the agent who is authorized to borrow the money also has authority to receive the money. Some of those cases involved loan brokers. In no case was the situation such that the lender knew that the money was to be used to pay for a building and that it was to be paid as the building advanced. They were cases in which the borrower was to receive a certain amount of money immediately. Naturally, where a broker or intermediary had the papers all executed in his possession to turn over to the lender, the authority for him to receive the money as a contemporaneous act with his delivering the papers would be implied. The situation is quite different where a building society knows that the money is to be paid out at certain times and that the person who is borrowing it shall have the right to withhold the money if the conditions in the contract for which the money is to be paid have not been met. Where the lender knows that the money is to be paid out by the borrower on the condition that certain things be done and therefore knows that the borrower has the right to know whether such conditions have been fulfilled, and where the person who negotiates the loan is the party upon whom those conditions are to be imposed, then there is no implied authority on the part of such person to receive the

money by reason of the fact that he is authorized to negotiate the loan.

Under all the facts in this case, we cannot say that the court came to a wrong conclusion. We must, therefore, sustain the court's finding in that regard. We also sustain the theory upon which the court came to its conclusions in rendering judgment. The building society cannot be classed as a volunteer. It knew that the money which it advanced was for the building. Miss Cloward knew it because that is the reason she executed the note and mortgage. Consequently, the money which went into the hands of the finance company and which was actually used in paying the cost of the construction of the building would be the basis of an equitable lien in favor of the building society. But there was no evidence upon which the court could apply its theory. In the matter of allowing attorney's fees to the building society, it was incorrect even though there was evidence as to a reasonable fee, because as stated heretofore, attorney's fees could not be allowed because the theory of the court precluded any recovery upon the contract which provided for attorney's fees.

There is complaint on the part of the building society regarding some minor deductions, which the court found were due Miss Cloward. Since this case must be reversed, the court will have an opportunity accurately to figure these items and make the proper deductions.

The judgment in favor of the building society against Cora Cloward is reversed with instructions to take evidence as to the cost of the building and for the purpose of determining what part of the money advanced by the building society to the finance company went into the building so as to predicate a proper judgment between these two parties thereon.

The judgment in favor of Wilcox and the judgment in favor of Ferguson are affirmed.

The appellant Cloward prevailed in the theory advanced by her that the finance company was not her agent to receive the money from the building society, but this theory

was neutralized by the theory of equitable lien in favor of the society, the judgment being reversed merely because there was not evidence to support the court's findings on the amount of money advanced by the society which went into the home. We think, therefore, that costs should not be awarded to appellant Cloward against the building society, but only in favor of Wilcox and Ferguson against Cloward and the society.

ELIAS HANSEN, C. J., and FOLLAND and EPHRAIM HANSON, JJ., concur.

MOFFAT, Justice (dissenting).

I am unable to agree with that part of the prevailing opinion wherein the finding and judgment of the trial court disallowing the homestead claim of Cora Cloward is affirmed. Cora Cloward pleaded her homestead right and offered evidence in support of the right. In the prevailing opinion it is said:

"In an equity case it has been the rule of this court not to disturb a finding of the lower court on contested or conflicting evidence unless the evidence clearly preponderates against the conclusion or finding."

If by "contested" evidence the same thing is meant as conflicting evidence, I agree with that statement of the law. The opinion then proceeds to say: "In a sense, the witnesses as to the time when work began were all interested. The court had a chance to observe their demeanor while on the stand. The finding of the court that the work of Wilcox was begun before the 6th day of June will therefore not be disturbed." Immediately following the above statement it is then said:

"Another conclusion of the court stands in the same category. We refer to the matter of homestead."

If it is meant that the rule of law applicable to equity cases to the effect that this court will not disturb a finding of the

lower court on conflicting evidence unless the evidence clearly preponderates against the conclusion or finding, I agree. If it is meant that the witnesses were all interested, I agree. If it is meant that the court had a chance to observe their demeanor while on the stand, I again agree. But if the statement, "stands in the same category," means that the finding against the homestead claim rests upon "contested or conflicting evidence," or that the evidence does not preponderate in favor of the homestead claim, then I do not agree.

Quoting at some length, the prevailing opinion states:

"Cora Cloward claimed a homestead because for twelve years her unmarried sister, Pearl, had lived with her and kept house while she taught school and had lived in this home from the time that Cora moved into it, between the 12th and 19th of September. Section 2905, Comp. Laws Utah 1917, in effect when this home was built, provides as far as material here, as follows:

" 'The phrase "head of a family" as used in this title includes within its meaning: * * *

" '2. Every person who is (has) residing on the premises with him or her and under his or her care and maintenance, either: (a) his or her child, or the child of his or her deceased wife or husband, whether by birth or adoption; (b) a minor brother or sister, or the minor child of a deceased brother or sister; (c) a father, mother, grandfather, or grandmother; (d) the father, mother, grandfather, or grandmother of a deceased husband or wife; (e) an unmarried sister, or any other of the relatives mentioned in this section, who have attained the age of majority and are unable to take care of or support themselves.'

"It will be noted that for one to be the head of a family where the family is constituted by such claimed head and an unmarried sister, there must concur with the element of care and maintenance and residence on the premises claimed as a homestead one other element not required in the case of the persons named in subsection 2, (a), (b), (c) and (d), to-wit, the element that the unmarried adult sister must be unable to care for and support herself."

Deferring the discussion of the matter involved in the above statement, the prevailing opinion proceeds to say:

"There was testimony in the case on the part of Miss [Cora] Cloward, Mrs. Watters, a married sister, and Pearl Cloward, the un-

married sister, that Pearl was sickly and had been since childhood days. She tired easily and was nervous and could not assume responsibility. It arose from children's diseases. She helped around the house but could not assume heavy house work. She had never tried to get work away from her sister. There was no question under the evidence but that Cora supported Pearl and maintained her. Counsel for Cora contend that there was no evidence to the contrary on the point that Pearl was unable to care for and support herself. This is the pivotal point in this question of homestead. The court saw Pearl in the court room. It was better able to judge from seeing her whether she was able to care for herself than we would be from reading the record. In such a matter the inspection of such a person is doubly valuable. She never had supported herself, but on the other hand the testimony was that she never tried. The court, in spite of the testimony of the three sisters, who either had a direct interest in the result of the suit or had the interest of a close relative, could best judge of their credibility and from the appearance and demeanor of Pearl whether she was able to support and care for herself. We cannot say, moreover, that the court was wrong if it concluded that if Pearl could do as much as she had done in keeping house for Cora that it might be concluded that she could earn her support doing the same for others. We cannot disturb the finding that Cora was not the head of a family as defined by section 2905, supra, when the family is alleged to be constituted by herself and her unmarried sister."

It is with this conclusion that I cannot agree. I am not satisfied that the construction placed upon the statute is correct. I think the person owning and residing upon the claimed homestead, and having the care and maintenance of such unmarried sister is the head of a family. I am of the opinion such homestead claimant has not the added burden of showing that the unmarried sister is "unable to take care of or support" herself. The section of the statute as it appears in its revised form (section 38-0-5, subsec. 2, R. S. Utah 1933), whether the revision was intended to change the statute, clarify it, or otherwise, does not impose the added element on the "unmarried sister" suggested in the prevailing opinion. It reads:

"Every person who has residing with him and under his care and maintenance, either: (a) His child, or the child of his deceased spouse,

whether by birth, or adoption; (b) a minor brother or sister, or the minor child of a deceased brother or sister; (c) a father, mother, grandfather or grandmother; (d) the father, mother, grandfather or grandmother of a deceased spouse; (e) an unmarried sister; (f) a brother or sister, or child of a deceased brother or sister, if unable to take care of or support himself."

The serious error to my mind is the evaporation of evidence by the application of a rule, wholesome enough in itself, whereby unimpeached, unimpaired, uncontradicted creditable evidence is disregarded and a finding directly contrary thereto is made. Where there is a direct conflict in the evidence and the determination of the fact in an equity case is dependent upon the credibility of the witnesses and the weight to be given to their testimony, then the fact that the trial court had opportunity to observe the witnesses and is in better position to weigh conflicting evidence is taken into consideration and in close cases may be the determining factor precluding this court from disturbing the findings made. *Utah Black Marble Co.* v. *American Marble & Onyx Co.*, 43 Utah 68, 133 P. 472.

We do not have such case. The witnesses who testified as to the elements going to the establishment of the ultimate fact of "head of a family" were not impeached, nor was their testimony in any particular discredited, impaired, or contradicted, as revealed by the record. On the point the evidence is all one way. The trial court is not at liberty to disregard creditable, uncontradicted, unimpeached, or unimpaired evidence and make a finding contrary thereto. *Parker* v. *Weber County Irrigation District*, 68 Utah 472, 251 P. 11.

The summary of the evidence as set out in the prevailing opinion, I think, should have led to a different conclusion. However, the evidence is fully and fairly abstracted. There are three witnesses unimpeached, not discredited, not contradicted. While they may be said to be related and interested, yet the record reveals in so far as a record may do so that they were fair, candid, and truthful, both on direct and cross-examination. There is nothing improbable or un-

reasonable in the evidence, nothing inconsistent, unusual, or unnatural about the circumstances, or anything related to the situation. On the contrary, it is just such a situation as might be expected to develop out of the circumstances shown. The following quoted from the abstract correctly reflects the evidence set out in the transcript with which it has been carefully compared. Cora Cloward testified:

"I have a sister living with me, Pearl Cloward. She has lived with me for twelve years. Prior to that she lived in the family home with her parents at Monroe, Utah. I am acquainted with her condition from the time she was a child. She has always been a sickly child. She has had all the diseases that children have, whooping cough, and measles. I don't remember the time. They left her with nervousness and it impaired her hearing and her eyesight. She was not able to go to school regularly. She was not strong enough. Since she grew older she hasn't had the best of health. She has been sickly and weak all her life. She has had doctors attending her. After our parents died I wanted her to come up and she came up with me, and since that time I have taken care of her, and it has been necessary for me to take care of her. I have supported her during that time. She has never had any property. Whatever she has received I have furnished it to her since the time she has lived with us. She has never been able to work out. She is not able to work. She helps keep the house for me, but as far as housecleaning or heavy work like that, she doesn't do it. She can help in the house. She is up and down during the daytime. She will always have to lay down in the morning after she has washed the dishes, and then again in the afternoon the same way. She is 48 years old. She is here in the Court room. I have had her under Dr. Hagan's care here in Spanish Fork, and I have paid for this care. During this time I have been teaching school. She has not been able to live alone. She always goes to my sister's when I am away. * * * During the twelve years that Pearl has lived with me I have taught school all the time. It has been necessary for me to have some one to take care of the house work. Pearl has taken care of the house work with my help. She has done some cooking, washing dishes, sweeping floors and gone down town occasionally. Made the beds and done some washing, and ironing for us two."

### Pearl Cloward testified:

"My name is Pearl Cloward. I live in Spanish Fork, with Cora. I have lived with her about twelve years. I remember about Cora Cloward going away in the summer sometime ago. I remember when

her home was built. She went away in June and came back some-time in August. * * * My health isn't good by any means. It has never been good that I remember of. Cora has been supporting me the last twelve years. Previous to that time I lived with my parents. My helath was not good then. I can do but very little work.

"Q. Just tell the Court how your strength is, and what you can do and what you have done as near as you can remember? A. Well, my sister Cora, she assumes all the responsibility of the home, and I help her wash dishes when I can, and I help with the meals when I can, and sometimes I try to make a bed, but I don't make very good at it. I do a little washing. I am not able to do it all the time. I am nervous, very nervous, and my eyesight is impaired. I went some to school, as much as I could, as much as my health would permit me to go. I stumbled through it. I don't think I made a great success of it. I was twenty-four years old when I was able to go through the eighth grade.

"Q. Tell the Court how you were able to go to school when you were young. A. Well I would go, maybe a day, and then I could be out two or three days, and then I would go again, and then maybe I wouldn't do it again. Maybe some years I got half of it and some years I didn't go any. That was on account of my health.

"Q. Would you be able to go out and work and get a job? A. I don't think I would.

"Witness further testified that she had no means of her own. That she didn't get anything in particular from her mother's estate. There was just a lot and it was sold and divided among a family of ten. I can't remember how many dollars I got. That was about twelve years ago when my mother died. I have never earned anything from working, outside of helping Cora. My health is nothing to brag of now. I am able to be around all day some days, and some days I am not. My doctor has been Dr. Hagan when I have had a doctor. I have called on him most of the time."

## Arminta Watters testified:

"That Pearl and Cora Cloward are her sisters. That she has been in a position to observe Pearl Cloward and know her condition during the most of her life. That she (Pearl) is 48 years of age. That she was a small, under-nourished baby, and that she has been in poor health as long as she, Mrs. Watters, could remember. She has never been able to go out to work. That she was acquainted with her schooling. That she went just at intervals. She was determined to go to school and would go when she could. Sometimes she would go six months, sometimes two months, sometimes one day and stay out

the rest of the week. That is the general condition of her school life. She was 24 years old when she quit school and that since that time she has been acquainted with her general condition. She is just poorly. Some days she is down and out and some days she feels pretty good. That has been the general condition all the time. She has never been robust. She is nervous. She has impaired eye-sight, and impaired hearing. She stayed at my home about two months during the summer of 1930. Her condition during those two months was just the same as it has always been. One day she would be able to help a little around the house, and may be the next day she wouldn't be able to do anything at all. That's the way it was during that time, and that's the way it has been during my knowledge of her. Her condition is now about the same as it has been in the past. She has never kept house on her own account.

"Recross examination by Mr. Morgan (Attorney for respondent) during which Mrs. Watters testified in substance, as follows:

"That Pearl has been staying with Cora. That she has washed dishes a part of the time, and doing a part of the cooking. She has done what you would call brushing up a little. She has been helping with the washing, but would never do it alone. She has done some ironing."

Under the evidence Pearl Cloward is a dependent. She is under the care and maintenance of Cora. To disrupt this household means to add to this satisfactory family set-up one more element of hardship and dependency which the homestead provisions of the Constitution and the law were designed to obviate. It is a policy of the state to foster home relationships, home ownership, and to encourage, establish, and help to maintain them. Homestead exemptions have for these reasons become a part of the public concern of the state. The law is always construed liberally in favor of homestead exemptions. I know of no reason why in weighing the evidence, if it became a case of weighing testimony, the same principle should not be applied. In the instant case to my mind the evidence and law establish that Cora Cloward is the head of a family as defined by the statute and is entitled to claim and have allowed to her a homestead exemption.

Had the house or home been the home of the parents of Cora and Pearl Cloward and Cora and Pearl had lived there

until the parents had died and the home had then been left to Cora and for the purpose of repairing the same the identical relationships as to liens, mortgage, and homestead had been set up, and under the same testimony, I have no doubt the trial court or any other tribunal charged with the responsibility of determining the questions here submitted would have declared Cora Cloward entitled to claim her homestead and would have allowed the same. For the reasons stated, I dissent.