2011 UT App 416

**FEDERAL DEPOSIT INSURANCE CORPORATION and Richard W. Jones, Trustee, Plaintiffs, Appellees, and Cross-appellants,**

v.

**Bradford E. TAYLOR, Gary D. McDonald, Lynnea J. McDonald, G&L Mac, Inc., and Casey Florence, as Beneficiaries; Chad C. Shattuck and Stanford A. Graham, as Trustees; and Gray Excavation, Inc., Defendants, Appellant, and Cross-appellee.**

No. 20100356–CA.

Court of Appeals of Utah.

Dec. 8, 2011.

Rehearing Denied Jan. 6, 2012.

Chad C. Shattuck, Draper, for Appellant.

Sherman C. Young and Dallas B. Young, Provo, for Appellees.

Before Judges McHUGH, ROTH, and CHRISTIANSEN.

OPINION

McHUGH, Associate Presiding Judge:

¶ 1 Bradford E. Taylor appeals the trial court's order granting a cross-motion for summary judgment in favor of Centennial Bank (the Bank),[1] in which the trial court

1. Subsequent to the events at issue, the Federal    Deposit Insurance Corporation (FDIC) acquired

held that due to Utah's after-acquired title statute, the Bank's trust deed was in first position with priority over Taylor's trust deed. The Bank cross-appeals, arguing that the trial court erred in denying summary judgment on its alternative theory of reformation. We reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND [2]

¶ 2 This is a dispute about the priority of certain trust deeds provided to the Bank and Taylor as security for loans made by them to the developers of a subdivision in Riverton, Utah (the Property). The development plans did not go as expected and the borrowers defaulted on the amounts due to the Bank and on their obligations to Taylor. Both lenders then attempted to foreclose on the Property, with each claiming first position. In order to understand the decision of the trial court and our analysis on appeal, it is necessary to explain in some detail the facts surrounding the loans made and the corresponding attempts to secure the indebtedness.

### A. The June 2006 Trust Deeds

¶ 3 In the spring of 2006, Ryan Andersen and Gary McDonald approached Taylor about a loan to be used to acquire the Property for the development of a subdivision. On June 1, 2006, Taylor loaned $335,000 to McDonald and Andersen, who each executed a promissory note that stated in relevant part, "PROCEEDS FROM THE SALE OF ANY LOTS SHALL BE DISBURSED FIRST TO [THE BANK] AND ANY AND ALL REMAINING FUNDS SHALL BE DISBURSED TO BRAD E. TAYLOR." To secure the obligation evidenced by the note, McDonald and Andersen, in their individual capacities, executed a deed of trust in favor of Taylor. At that time, however, G&L Mac,

Inc., a corporation controlled by McDonald, held title to the Property.

¶ 4 According to Taylor's affidavit, filed in connection with the cross-motions for summary judgment, the negotiations regarding the loan were primarily with Andersen. Andersen promised that Taylor's "loan would be secured in first position on the [P]roperty" and that the money would be used to purchase the Property so that Andersen and McDonald could then obtain a construction loan from the Bank. Taylor's affidavit also indicates that he and Andersen agreed to use First Southwest Title Agency of Utah, Inc. (First SW Title) to act "as a middleman to release the funds [Taylor] was loaning only after [Taylor's] position was secured against the [P]roperty." "[O]n June 1, 2006, [Taylor] caused $226,000 to be wired to First [SW] Title for G&L Mac, Inc. The wire was completed on June 2, 2006 by 12:14 p.m.," and Taylor expected G&L Mac to add $175.17 to that amount, for a total of $226,175.17. Taylor indicates that "it is my understanding that First [SW] Title wired the money ($226,-175.17) to Mountain View [T]itle on June 2, 2006, shortly after receiving my wire of $226,000." Taylor further states that he specifically instructed First SW Title not to fund the loan to Andersen and McDonald until the trust deed was recorded. However, First SW Title did not record the trust deed on that date.[3]

¶ 5 On June 2, 2006, McDonald, again acting in his individual capacity, executed a trust deed in favor of the Bank in exchange for a $1,704,375[4] acquisition and development loan (Construction Loan Agreement). G&L Mac was still the record owner of the Property when McDonald executed the trust deed. The Bank was aware of that fact and anticipated that a warranty deed conveying the Property from G&L Mac to McDonald would be executed and recorded as part of the loan transaction. However, the warranty

---

Centennial Bank's interest in the trust deed. For purposes of this decision, we refer to FDIC and Centennial Bank, collectively, as the Bank.

**2.** We recite the facts consistent with the undisputed facts agreed to by the parties in the trial court, unless otherwise indicated.

**3.** Taylor's affidavit is silent as to the disbursement of the additional $124,000 that McDonald and Andersen borrowed pursuant to the $335,000 promissory note.

**4.** We round this number to $1.7 million for purposes of our discussion.

deed was not prepared, executed, or recorded at that time. According to the Bank's affidavits, its loan was conditional upon the Bank's trust deed being recorded in first position against the Property. The Bank also states that the

> purpose of the Loan, (a) was to pay off two loans, to Millennia Investment Corporation and Cottonwood Assets [, that both had liens on the Property], (b) was to be a personal loan secured by a first lien on Property located in Riverton, Utah, to be owned by Gary McDonald personally, and (c) ... [was to be used] to acquire the Property, clear title to the Property of all liens and encumbrances, and pay for the improvements for a subdivision on the Property.

The Construction Loan Agreement executed by McDonald included "Representations and Warranties," stating that McDonald held title to the Property and that he had not granted any undisclosed encumbrances against the Property. It also provided that the loan was to be repaid through the sale of lots in the completed subdivision.

¶ 6 The Bank wired $864,452.23 to Mountain View Title on June 2, 2006, to be used to pay off the Millennia Investments and Cottonwood Assets liens. The Bank concedes, however, that "[a]lso on June 2, 2006, Mountain View Title and Escrow received another wire transfer from Centennial Bank's Ogden Utah office in the amount of $226,175.17." [5] The settlement statement from the transaction indicates that McDonald was required to contribute $224,536.37 to the closing costs. Mountain View Title used both the $226,175.17 amount and the $864,452.23 amount to pay off the loans secured by the Millennia Investment and Cottonwood Assets liens. The Bank recorded its trust deed securing its loan to McDonald on June 2, 2006, the same day it was executed (6/2/06 TD). On June 5, 2006, three days after the Bank recorded its trust deed against the Property, First SW Title recorded the trust deed executed by McDonald and Andersen in favor of Taylor (6/5/06 TD).

**B. The September 2006 Trust Deed**

¶ 7 Several months later, while considering whether to lend additional sums to McDonald and Andersen for a sewer bond, Taylor discovered that G&L Mac was the record owner of the Property. Taylor became concerned that his 6/5/06 TD was invalid because it was signed by McDonald individually, rather than in a representative capacity for G&L Mac. In an attempt to cure this defect and to secure the additional funds advanced, Taylor obtained a new trust deed executed by G&L Mac as security for both loans. The promissory note in the amount of $435,000 that was secured by the new trust deed contained language identical to that in the June promissory note, indicating that the Bank would be paid first from the sale of lots in the proposed development. Taylor's affidavit indicates that he was not concerned about allowing the Bank to be paid out of lot sales because he knew his trust deed was in first position in the event of foreclosure. Taylor wrote a check to South Valley Sewer District for $100,000 to cover the cost of the sewer bond for the subdivision on September 5, 2006. Taylor recorded his new trust deed on September 6, 2006 (9/6/06 TD).

**C. The December 2006 Warranty Deed**

¶ 8 In December 2006, the Bank realized that its 6/2/06 TD had been executed by McDonald in his individual capacity but that the Property had not been conveyed by G&L Mac to McDonald as anticipated. The Bank decided to remedy the defect by asking McDonald, as president of G&L Mac, to execute a special warranty deed conveying title of the Property from G&L Mac to McDonald. The Bank recorded that special warranty deed on December 22, 2006.

**D. Procedural Background**

¶ 9 McDonald defaulted on the obligations under the promissory notes to Taylor and to the Bank. Both lenders sought to foreclose

**5.** Although the amount is identical to the funds transferred to Mountain View Title by First SW Title on behalf of Taylor and McDonald, the affidavits do not state whether First SW Title had first forwarded those funds to the Bank so that the Bank could send them on to Mountain View Title.

on their trust deeds, with each asserting that its loan was secured by a first position trust deed. This lawsuit followed. On August 19, 2009, the parties filed cross-motions for partial summary judgment on the issue of the priority of their respective interests in the Property. The Bank argued that it was entitled to priority (1) under the doctrine of equitable subrogation, (2) by reformation of the original loan transaction to include a warranty deed from G&L Mac to McDonald, and (3) because the Bank's 6/2/06 TD was in first position by operation of the after-acquired title statute. In response, Taylor asserted that (1) the doctrine of equitable subrogation gave priority to Taylor as the first innocent lender; (2) the doctrine of reformation is limited to the correction of scrivener's errors and cannot be used to create a warranty deed that was not prepared at the time; (3) the after-acquired title statute cannot invalidate his prior 9/6/06 TD because Taylor is a bona fide purchaser for value who took without notice of the Bank's interest, while the Bank had notice of Taylor's 9/6/06 TD when it recorded the December 22, 2006 warranty deed; and (4) Taylor filed his notice of default first, thereby giving him the right to conduct his foreclosure sale first.

¶ 10 On October 6, 2009, the trial court denied both parties' motions for summary judgment. The trial court first concluded that Taylor's 6/5/06 TD and the Bank's 6/2/06 TD were invalid because they were not executed by the owner of the property, and that Taylor was the first to discover the error and to record a trust deed from the record owner. Next, the trial court rejected the Bank's reformation argument, concluding that "this is not a case where the instruments themselves contain mistakes which were contrary to the parties' intent. . . . The Court is satisfied that the doctrine of reformation is simply inapplicable" where the "only error [is] that one additional document was not provided and therefore not executed." The trial court was equally unpersuaded by the parties' arguments based on equitable subrogation, explaining that "equitable principles cannot be invoked to undo or otherwise alter the results and remedies" provided by the statutory provisions affecting interests in real property. Instead, the trial court identi-

fied the "core issue" of the dispute as the interplay between Utah's after-acquired title statute and Utah's race-notice principles. Although the trial court indicated that it "could conclude that when Defendant G&L [Mac] conveyed title to the [P]roperty to Defendant McDonald in December 2006, that conveyance was subject to Defendant Taylor's lien," it did not so rule at that time, instead permitting the parties to submit supplemental briefing on the issue.

¶ 11 On December 7, 2009, after additional briefing and argument, the trial court issued a second memorandum decision, concluding that by operation of the after-acquired title statute, the Bank's 6/2/06 TD became effective upon execution of the warranty deed from G&L Mac to McDonald. The trial court further held that, because Taylor had notice of the Bank's invalid trust deed when he recorded his own trust deeds on June 5, 2006, and September 6, 2006, the after-acquired title statute gave the Bank's 6/2/06 TD first priority. Both parties now appeal.

## ISSUES AND STANDARD OF REVIEW

¶ 12 Taylor argues that the trial court erred when it granted the Bank's motion for partial summary judgment. In addition, the Bank has filed a cross-appeal, asserting that the trial court erred when it denied summary judgment on the Bank's claim of reformation. Summary judgment is appropriate only when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." See Utah R. Civ. P. 56(c). "Because summary judgment involves questions of law, we grant no deference to the district court's ruling and review it for correctness." *Haik v. Sandy City*, 2011 UT 26, ¶ 10, 254 P.3d 171 (citing *Mitchell v. Christensen*, 2001 UT 80, ¶ 8, 31 P.3d 572). Further, "[w]e may affirm a district court's entry of summary judgment if it is sustainable on any legal ground or theory apparent on the record." *Id.* (internal quotation marks omitted).

## ANALYSIS

¶ 13 The trial court concluded that the interplay between two provisions of the Utah

Code, section 57–1–10 (after-acquired title statute), *see* Utah Code Ann. § 57–1–10 (2010),[6] and section 57–3–103 (recording statute), *see id.* § 57–3–103, resulted in the Bank's 6/2/06 TD enjoying priority over Taylor's 9/6/06 TD. Taylor argues that the trial court erred because his 9/6/06 TD attached to the Property before McDonald received title from G&L Mac and, therefore, the interest that passed to the Bank under the after-acquired title statute was similarly encumbered.

¶ 14 The resolution of this issue depends on whether the after-acquired title statute affects the priority of property interests. We hold that it does not. Instead, we conclude that while the after-acquired title statute conveys title, the priority of competing interests is determined by Utah's race-notice principles. *See id.* §§ 57–3–102 to –103. Applying those principles, we first determine that the June trust deeds in favor of Taylor and the Bank were ineffective to convey title but, nevertheless, created equitable liens against the Property. We then conclude that when Taylor filed his September trust deed, he had notice of a prior equitable lien in favor of the Bank. Accordingly, we next consider whether notice of an equitable interest, under the facts present here, would be sufficient to invalidate Taylor's status as a good faith purchaser. We hold that it would and that Taylor did not take his 9/6/06 TD in good faith. Consequently, the Bank's equitable interest is not "void" as against Taylor's 9/6/06 TD. *See generally id.* § 57–3–103 (providing that a prior unrecorded interest is void if a subsequent purchaser takes in good faith and records first). We next conclude that the December warranty deed from G&L Mac to McDonald is subject to Taylor's 9/6/06 TD because that trust deed was recorded first. Finally, we reject the Bank's alternative theory of reformation on two grounds. First, even if reformation is available to create an entire document omitted from closing, it requires that any mistake be mutual. Yet, the Bank has come forward with no evidence as to McDonald's intent concerning the June 2006 loan transaction.

Second, because reformation will be applied retroactively only to the extent that it does not prejudice innocent third parties, the Bank's June transaction cannot be reformed to include the warranty deed if doing so would invalidate a prior equitable lien in favor of Taylor that accrued when he had no knowledge of a prior interest of the Bank. Thus, even if the Bank's June transaction could be reformed in theory, the Bank has not met its burden of proving that it is entitled to reformation as a matter of law.

¶ 15 Ultimately, we conclude that despite the efforts of the Bank and Taylor to record later documents against the Property, the interests of the parties are dependent upon the order in which the equitable liens accrued in June 2006. Because there are disputed issues of material fact regarding this question, we reverse the summary judgment in favor of the Bank and remand to the trial court for further proceedings.

## I. The After–Acquired Title Statute Does Not Govern the Priority of Interests in Real Property.

¶ 16 The trial court held that Utah's after-acquired title statute trumps the recording statute by allowing a conveyance triggered by the after-acquired title statute to prevail over the interest of a subsequent purchaser who obtained title from the record owner of the property and recorded the document evidencing that interest during the interim between the conveyance by the titleless grantor and that grantor's subsequent acquisition of title. "It is well settled that when faced with a question of statutory interpretation, 'our primary goal is to evince the true intent and purpose of the [l]egislature,' " *see Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (quoting *Salt Lake Cnty. v. Holliday Water Co.*, 2010 UT 45, ¶ 27, 234 P.3d 1105), and that " 'the best evidence of the legislature's intent is the plain language of the statute itself,' " *id.* (quoting *State v. Miller*, 2008 UT 61, ¶ 18, 193 P.3d 92). Thus, we begin our

**6.** Because the relevant statutory provisions are substantively unchanged, we cite the current version of the code as a convenience to the reader.

analysis with an examination of the plain language of the statute.

¶ 17 Utah's after-acquired title statute provides, in relevant part,

(1) If any person conveys any real estate by conveyance purporting to convey the real estate in fee simple absolute, and at the time of the conveyance the person does not have the legal estate in the real estate, but afterwards acquires the legal estate:

(a) the legal estate subsequently acquired immediately passes to the grantee, the grantee's heirs, successors, or assigns; and

(b) the conveyance is as valid as if the legal estate had been in the grantor at the time of the conveyance.

Utah Code Ann. § 57–1–10(1)(a)–(b). Pursuant to the statute, "a conveyance made by a grantor not holding fee title to property is binding when the grantor later obtains fee title." *Arnold Indus., Inc. v. Love*, 2002 UT 133, ¶ 16, 63 P.3d 721. Here, it is undisputed that when McDonald executed the Bank's 6/2/06 TD and Taylor's 6/5/06 TD, he did not hold fee title to the Property. Rather, he was the president of a company, G&L Mac, that held title. McDonald first obtained an interest in the Property in December 2006, when G&L Mac conveyed the Property to McDonald by warranty deed. By virtue of the after-acquired title statute, "the legal estate subsequently acquired," by McDonald was then conveyed "as if" McDonald had been vested with title to the Property on June 2, 2006. *See* Utah Code Ann. § 57–1–10(1)(a)–(b). Both the Bank and Taylor argue that this language plainly mandates a decision in their favor.

¶ 18 Taylor notes that the after-acquired title statute indicates that only "the legal estate subsequently acquired" passes to the grantee when his grantor obtains title and that only that legal estate is treated "as if" title had been vested earlier. *See id.* § 57–1–10(1)(a) (2010). He argues that because G&L Mac had already conveyed the Property in trust to him in September, its December conveyance to McDonald was necessarily subject to that trust deed. Thus, Taylor contends that "the legal estate subsequently acquired" by the Bank is derived from a fee title subject to his preexisting trust deed. In response, the Bank argues that the statute's use of the phrase "as if the legal estate had been in the grantor at the time of the conveyance" means that the Bank's 6/2/06 TD is deemed to have been valid when filed. As a result, the Bank contends that its 6/2/06 TD is first in time and takes priority over Taylor's 9/6/06 TD. We agree with Taylor that under the plain language of the statute, the Bank's after-acquired interest in the Property could be no greater than the estate that G&L Mac conveyed to McDonald in December 2006. That estate was already encumbered by Taylor's 9/6/06 TD.

¶ 19 First, it is a basic tenent of property law that G&L Mac could convey to McDonald only what it then owned. *See A.C. Fin., Inc. v. Salt Lake Cnty.*, 948 P.2d 771, 776 (Utah 1997) (recognizing as a "well-established concept[ ] of title" that an owner in fee who "remains subject to the State's claim on the property for taxes" "cannot grant a lender a greater interest-one which is not subject to that claim"); *Eskelsen v. Town of Perry*, 819 P.2d 770, 772 (Utah 1991) ("A transferee cannot receive any more water rights than the transferor can convey."); *Drazich v. Lasson*, 964 P.2d 324, 327 (Utah Ct.App.1998) ("One can only convey as much estate in land as one actually has."). Thus, G&L Mac could not convey title to McDonald free of Taylor's prior trust deed and nothing in the plain language of Utah's after-acquired title statute requires a different conclusion. Instead, the statute operates to convey title in the condition then existing and contains no language purporting to affect the priority of competing interests. *See* Utah Code Ann. § 57–1–10 (stating that the "conveyance is as valid as if the legal estate had been in the grantor at the time of the conveyance"). *Compare id.* §§ 57–1–10 to –46 (dealing with conveyances), *with id.* §§ 57–3–101 to –204 (dealing with the effect of recording documents evidencing an interest in real property).

¶ 20 Second, this conclusion is consistent with the only Utah authority we have found that addresses the effect of the after-acquired property statute on preexisting liens.

In *Utah Farm Production Credit Ass'n v. Wasatch Bank of Pleasant Grove*, 734 P.2d 904 (Utah 1987) (per curiam),[7] one purchaser (former purchaser) under a real estate purchase contract (REPC) executed a warranty deed conveying his interest to the other purchaser (remaining purchaser) before either of them had anything other than an equitable interest in the property. *See id.* at 905. The warranty deed was recorded on February 25, 1976. *See id.* One month later, the remaining purchaser assigned his equitable rights in the REPC to a family-controlled company, which then assigned the interest in trust as security for a series of loans. *See id.* The lender (first lender) recorded the assignments against the property. *See id.* In 1979, a warranty deed from the sellers conveying the property to both purchasers was recorded. *See id.* The following year, the remaining purchaser executed a trust deed in favor of a second lender. *See id.* After the remaining purchaser defaulted on the repayment obligations to both lenders, the second lender filed a quiet title action, asserting that the first lender's position had been extinguished by operation of the after-acquired title statute. *See id.* The trial court granted summary judgment in favor of the first lender, and the Utah Supreme Court affirmed, stating that "the fee simple title [the former purchaser] acquired in the [property] in 1979 immediately passed to [the remaining purchaser]" pursuant to the after-acquired title statute, but that "[a]t that time, [the first lender] had perfected the recordings of its assignments, and [the remaining purchaser] therefore received title subject to the lien." *Id.* at 905–06. The supreme court explained, "The transfer of property subsequent to the attachment of the lien does not affect the lien for 'it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere....'"[8]

Id. at 906 (omission in original) (quoting *Kipnis v. County of Maricopa*, 105 Ariz. 572, 468 P.2d 931, 932 (1970) (en banc)).

¶ 21 *Utah Farm* illustrates that the after-acquired title statute conveys title in the condition as it exists at the time title is acquired by the previously titleless grantor. Because the first lender's liens had attached before the remaining purchaser received legal title (to his own half directly from the sellers and to the former purchaser's half by operation of the after-acquired title statute), the remaining purchaser acquired title subject to the previous encumbrances. *See id.* at 905–06. Therefore, the remaining purchaser could only convey title to the second lender in the commensurately limited estate. Applying that reasoning here, in December 2006, G&L Mac conveyed title to McDonald subject to Taylor's 9/6/06 TD.[9]

¶ 22 Third, this result is consistent with the rationale of the after-acquired title statute, which is premised on the concept of estoppel by deed. *See Arnold Indus., Inc. v. Love*, 2002 UT 133, ¶ 16, 63 P.3d 721 (citing *Hall v. Fitzgerald*, 671 P.2d 224, 228 (Utah 1983) (noting that the after-acquired title statute "has codified in part the equitable doctrine of estoppel by deed")).

[W]here there is in the deed an express or implied representation that the grantor at the time of his conveyance was possessed of the title which his deed purports to convey, if such representation is false, whether he committed a fraud or was acting under an honest mistake, he is estopped from denying that he has a title; and, consequently, if he afterwards acquire[s] the title, he cannot by setting it up defeat his own grant.

*Dowse v. Kammerman*, 122 Utah 85, 246 P.2d 881, 882 (1952). The premise of the

---

7. Although *Utah Farm Production Credit Ass'n v. Wasatch Bank of Pleasant Grove*, 734 P.2d 904 (Utah 1987), is a per curiam decision, it has been cited favorably without reference to its per curiam status for the proposition that property passes subject to a preexisting lien. *See, e.g., Cannefax v. Clement*, 818 P.2d 546, 549 (Utah 1991); *Reinbold v. Utah Fun Shares*, 850 P.2d 487, 491 (Utah Ct.App.1993).

8. "Cum onere" means "[w]ith the burden. An item acquired *cum onere* is taken subject to existing burdens and charges." *See Black's Law Dictionary* 437 (9th ed. 2009).

9. This result is even more compelling here than in *Utah Farm* because in *Utah Farm* the intervening encumbrance was created by the titleless grantee, *see* 734 P.2d at 905, while here Taylor's 9/6/06 TD was conveyed by the record owner of the Property.

deed by estoppel rule is to prevent a grantor without title from later challenging his own conveyance of the property. *See* Annotation, *Nature of Conveyance or Covenants Which Will Create Estoppel to Assert After–Acquired Title or Interest in Real Property,* 58 A.L.R. 345 (1929) ("It is a general rule, supported by many authorities, that a deed purporting to convey a fee simple, or a lesser definite estate in land, and containing covenants of general warranty of title or of ownership, will operate to estop the grantor from asserting an after-acquired title or interest in the land, or the estate which the deed purports to convey, as against the grantee and those claiming under him."). Where a purchaser obtains title from the actual owner of the property, the theory of deed by estoppel is inapplicable because that owner did not attempt to sell property he did not own. Consequently, there is no equitable reason for the "wild" deed from a titleless grantor to work as an estoppel of the valid deed obtained from the record owner.

¶ 23 Fourth, an interpretation that the after-acquired title statute displaces the recording act would undermine the purposes of Utah's race-notice principles. *See* Utah Code Ann. § 57–3–102 (2010) (providing that recording of a document imparts knowledge of its contents); *id.* § 57–3–103 (providing that an unrecorded document is void as against a subsequent purchaser for value who took without notice of the prior unrecorded interest). The recording statute is "intended to impede fraud, to foster the alienability of real property, and to provide for predictability and integrity in real estate transactions." *Capital Assets Fin. Servs. v. Maxwell,* 2000 UT 9, ¶ 18, 994 P.2d 201. If we adopted the view that the recorded interest of a party obtained for value from the record owner is void as against an interest in the property previously conveyed by someone who had no right to convey it, that intent would not be advanced. Instead, such an approach would be directly contrary to the recording statute's purpose "to protect the purchaser's interest against the asserted interest of any third parties, and to inform third parties of the existence of pre-existing encumbrances on the property." *See Horman v. Clark,* 744 P.2d 1014, 1016 (Utah Ct.App.1987) (citations omitted). Indeed, the adoption of the Bank's position would allow a person with no current interest in the property to affect its alienability by purporting to convey it to an unsuspecting third party and then making that attempt known to potential grantees of the real owner. We see nothing in the after-acquired title statute that supports such an anomaly.

¶ 24 In sum, while holding record title to the Property, G&L Mac conveyed a trust deed to Taylor that was duly recorded, thereby giving notice of its contents to all. *See* Utah Code Ann. § 57–3–102. Upon execution of a trust deed, "[a]ll right, title, interest and claim in and to the trust property ... shall inure to the trustee as security for the obligation or obligations for which the trust property is conveyed." *Id.* § 57–1–20. Thus, G&L Mac's subsequent conveyance of the Property to McDonald was subject to that trust deed. "To hold otherwise would defeat the purpose of the recording statutes and subvert the sound commercial policy they promote." *Diversified Equities, Inc. v. American Sav. & Loan Ass'n,* 739 P.2d 1133, 1137 (Utah Ct.App.1987).

## II. The Priority of the Competing Trust Deeds Is Governed by Utah's Recording Act.

¶ 25 While the after-acquired title statute operates to convey title, the validity of competing interests in real property is generally governed by Utah's recording statutes. *See* Utah Code Ann. § 57–3–102(1) (providing that documents "from the time of recording with the appropriate county recorder, impart notice to all persons of their contents"); *id.* § 57–3–103 (providing that an unrecorded document is void against a subsequent purchaser who "purchased the property in good faith and for a valuable consideration," and whose "document is first duly recorded"). Pursuant to Utah's race-notice recording scheme, "between two purchasers of real property, the first to validly record a conveyance and take the property without notice of a prior interest in the property takes the property over a purchaser who subsequently records a deed." *See Ault v. Holden,* 2002 UT 33, ¶ 31, 44 P.3d 781 (citing

*Wilson v. Schneiter's Riverside Golf Course*, 523 P.2d 1226, 1227 (Utah 1974)). Specifically, "a subsequent purchaser for value prevails over a previous purchaser if the subsequent purchaser (1) takes title in good faith and (2) records before the previous purchaser." *Haik v. Sandy City*, 2011 UT 26, ¶ 13, 254 P.3d 171. In order to be a good faith purchaser, " 'a subsequent purchaser must take [title to] the property without notice of a prior, unrecorded interest in the property.' " *Id.* ¶ 14 (alteration in original) (quoting *Salt Lake Cnty. v. Metro W. Ready Mix, Inc.*, 2004 UT 23, ¶ 13, 89 P.3d 155).

¶ 26 We now apply these principles to our priority analysis in this case by examining what interests in the Property were created and when, as well as the grantee's knowledge of any preexisting interests. In doing so, we are mindful that this matter comes to us on summary judgment, thereby mandating that we consider the facts in the light most favorable to Taylor, the nonmoving party. *See Park v. Stanford*, 2011 UT 41, ¶ 27, 258 P.3d 566. To grant summary judgment, there must be no material factual issues in dispute and the moving party must be entitled to judgment as a matter of law. *See* Utah R. Civ. P. 56(c).

A. The June Trust Deeds Were Ineffective to Transfer Title, But They Were Evidence of Equitable Liens on the Property.

¶ 27 On June 1, 2006, Taylor agreed to loan $335,000 to McDonald and Andersen with the understanding that the loan would be secured by a first position trust deed. Because the Property was owned by G&L Mac, the trust deed executed by McDonald in his individual capacity was not effective to convey the Property in trust with Taylor as a beneficiary. *See Dunlap v. Stichting Mayflower Mountain Fonds*, 2003 UT App 283, ¶¶ 11–13, 76 P.3d 711 (holding that the subsequent grantee took free of a trust deed that was executed by an entity other than the record owner). On June 2, 2006, the Bank made a $1.7 million loan to McDonald with the understanding that it would be secured by a first position trust deed against the Property. Again, however, McDonald exe-

cuted the trust deed in his individual capacity despite the fact that G&L Mac held title to the Property. Thus, the Bank's 6/2/06 TD was also ineffective to transfer title to the Property in trust for the benefit of the Bank.

¶ 28 According to Taylor, these transactions nevertheless gave him priority because he "lent money against the [P]roperty before the Bank did." In determining the effect of the June transactions, our decision in *General Glass Corp. v. Mast Construction Co.*, 766 P.2d 429 (Utah Ct.App.1988), is instructive. There, this court held that a trust deed that was ineffective to transfer title due to the failure to name the trustee was nevertheless effective to create a mortgage lien. *See id.* at 432–33. Because the "clear intention of the parties that [the lender] be given an interest in the described project property to secure repayment of its loan to [the borrower] appear[ed] repeatedly on the face of the document," the court concluded that the trust deed, although ineffective to transfer title, was "a valid legal mortgage giving [the lender] a lien against the project property." *Id.* This court further reasoned that the recorded trust deed "imparted notice of its contents to third parties as of the recording date." *Id.* at 435. Hence, we affirmed the trial court's ruling that the lender's equitable interest had priority over a later-recorded mechanics' lien because no work had been performed on the project property prior to the date the lender recorded the ineffective trust deed. *See id.* at 436.

¶ 29 In this case, although the Bank's 6/2/06 TD and Taylor's 6/5/06 TD were not signed by G&L Mac; they were executed by its president, McDonald, who had authority to act for the company. Indeed, McDonald later conveyed the Property to himself by executing a warranty deed in a representative capacity on behalf of G&L Mac. Thus, despite McDonald's failure to act in a representative capacity with regard to the Bank's 6/2/06 TD and Taylor's 6/5/06 TD, the "clear intention of the parties [was] that [Taylor and the Bank] be given an interest in the described [Property] to secure repayment" of the loans. *See id.* at 432. Finally, both Taylor and the Bank advanced funds that were used to acquire and improve the

Property. Under these circumstances, Taylor and the Bank each obtained an equitable interest in the Property to secure the loans. *See id.* at 432–33; *see also Harline v. Daines,* 567 P.2d 1120, 1121 (Utah 1977) (affirming the trial court's imposition of an equitable lien in favor of limited partners for amounts paid to bring mortgage payments current on property owned by the limited partnership); *Utah Coop. Ass'n v. White Distrib. & Supply Co.,* 2 Utah 2d 391, 275 P.2d 687, 691 (1954) (remanding for additional evidence and findings on whether the unauthorized use of corporate assets to build a structure on a property owned by the corporate president gave the corporation an equitable lien on the property in the amount of the funds so used). *But see Diversified Equities, Inc. v. American Sav. & Loan Ass'n,* 739 P.2d 1133, 1136 (Utah Ct.App.1987) (deciding that an "equitable lien" in favor of the bank that had inadvertently released a trust deed was ineffective as against a warranty deed conveyed to a good faith purchaser). Therefore, we must now consider the priority of those equitable liens.

¶ 30 The Bank claims that Taylor's encumbrance is in second position behind the Bank's lien because it claims that Taylor knew when he funded his loan in June that the Bank's loan would be secured in first position. Taylor has come forward with affidavit evidence disputing that allegation and instead claiming that McDonald and Andersen assured Taylor that his trust deed would be recorded before the Bank's trust deed. Again, for purposes of summary judgment, we view the facts and inferences in favor of Taylor. *See Park,* 2011 UT 41, ¶ 27, 258 P.3d 566. On remand, however, the trial court should weigh the conflicting evidence and resolve this factual issue. If the evidence establishes that the parties, including Taylor, intended that his trust deed would be recorded behind the Bank's trust deed, the intent of the parties should govern the competing equitable interests. *See General Glass,* 766 P.2d at 432–33 (enforcing the intent of the parties). If, on the other hand, the facts do not support such a finding, the priority of the equitable liens is dependent upon which first accrued. *See* Utah Code Ann. §§ 57-3-101 to –102 (2010). In *Greger-*

*son v. Jensen,* 669 P.2d 396 (Utah 1983), neither of the parties claiming an interest in the subject property had recorded the document on which they relied for their claim. *See id.* at 398. As a result, the Utah Supreme Court relied on "general principles of law that govern the priorities of successive interests apart from the recording acts." *Id.* The *Gregerson* court explained that the priority of legal interests outside the recording act are resolved by the earliest in time. *See id.* ("[A]part from statute, transfers of the legal title to land rank, between themselves, according to priority in time."). The same is true of equitable interests in real property. "The general rule that where the equities are otherwise equal the older in point of time prevails is applicable to the purchaser of an equitable interest in real estate." 77 Am. Jur.2d *Vendor & Purchaser* § 373 (2011); *see also* Herbert T. Tiffany, *The Law of Real Property* § 1260 (3d. ed. 1939) ("As between interests or claims of a purely equitable character ... priority of time will prevail, that is, they will rank according to their time of accrual. And the fact that the later equity is acquired without notice of the earlier equity is ordinarily immaterial in this connection." (footnote omitted)). Thus, the equitable liens that arose in favor of the Bank and Taylor as a result of the June transactions are payable in the order in which they accrued, unless the parties agreed otherwise.

¶ 31 Further, while Taylor argues that the issue of accrual should be determined by which lender first delivered its funds to the title company, we conclude that the proper inquiry is when the money was released to the borrower for the acquisition or improvement of the Property. *Cf. American Tierra Corp. v. City of W. Jordan,* 840 P.2d 757, 761–63 (Utah 1992) (holding that an equitable interest accrued when each party paid the challenged impact fees); *Harline,* 567 P.2d at 1123 (affirming the trial court's imposition of an equitable lien in the amounts advanced by the plaintiffs and "transmitted immediately ... to bring current the mortgage payment, which had been in default"); *Wilcox v. Cloward,* 88 Utah 503, 56 P.2d 1, 11 (1936) (recognizing an equitable lien in the amount "actually used in paying the cost of the con-

struction of the building" on the owner's property).

¶ 32 Although Taylor contends that he was the first to fund his loan to McDonald, the record is not clear on that issue. When the Bank's loan to McDonald closed on June 2, 2006, $864,452.23 of the funds provided by the Bank and $226,175.17 that may have come from Taylor were wired to Mountain View Title. It appears that both of those amounts were then used to remove the Millennia Investments and Cottonwood Assets liens from the Property. Because we are unable to determine when and in what amounts the funds advanced by Taylor and the Bank were released for the benefit of the Property, we are also unable to determine the priority of their equitable liens.

¶ 33 This is true even though the Bank recorded its ineffective 6/2/06 TD first and did so while unaware of Taylor's prior equitable interest. Utah Code section 57–3–103 provides that unrecorded documents are void against a subsequent "purchaser" who took title in good faith, took for value, and recorded its document first. *See* Utah Code Ann. § 57–3–103. Because the Bank's 6/2/06 TD was ineffective to transfer title, the Bank was not a "purchaser" covered by section 57–3–103. Furthermore, the Bank's trust deed was a "wild" trust deed—not in the chain of title—because it was executed by someone other than the record owner. In *Salt Lake County v. Metro West Ready Mix, Inc.*, 2004 UT 23, 89 P.3d 155, the Utah Supreme Court explained that "a purchaser whose chain of title is founded on a wild deed cannot be a bona fide purchaser under Utah's Recording Statute." *Id.* ¶ 17. The *Metro West* court reasoned that the purchaser is charged with notice that his grantor is not on record as the owner of the property and, therefore, takes with notice of a defect in his grantor's title. *See id.* Thus, the Bank was not a purchaser without notice. "[T]he recording statutes do not protect such a purchaser as against an unrecorded interest in the same [property]." *Id.* ¶ 18. Accordingly, as of June 2006, the interests of the Bank and Taylor were merely equitable and priority as between those

equitable interests involves questions of fact that cannot be resolved on summary judgment.

**B. As a Matter of Law, Taylor Took His September 6, 2006 Trust Deed with Knowledge of the Bank's Equitable Interest.**

¶ 34 On September 5, 2006, Taylor loaned an additional $100,000 to McDonald and Andersen. At that time, Taylor obtained a valid trust deed from G&L Mac conveying the Property in trust to secure a promissory note in the amount of $435,000.[10] First SW Title recorded the trust deed on September 6, 2006. Because this is the first trust deed that effectively conveyed title to the Property in trust, Taylor claims that his 9/6/06 TD has priority over any equitable interest in favor of the Bank. We disagree.

¶ 35 Cases interpreting Utah's recording statute indicate that "a subsequent purchaser for value prevails over a previous purchaser if the subsequent purchaser (1) takes title in good faith and (2) records before the previous purchaser." *Haik v. Sandy City*, 2011 UT 26, ¶ 13, 254 P.3d 171 (citing Utah Code Ann. § 57–3–103 (2010)). There is no dispute that Taylor recorded his 9/6/06 TD before McDonald executed the special warranty deed that conveyed actual title from G&L Mac to McDonald personally. Thus, the determinative question is whether Taylor took his 9/6/06 TD in good faith. " 'To be in good faith, a subsequent purchaser must take [title to] the property without notice of a prior, unrecorded interest in the property.' " *Id.* ¶ 14 (alteration in original) (quoting *Metro West*, 2004 UT 23, ¶ 13, 89 P.3d 155).

¶ 36 Utah courts recognize both actual notice and constructive notice. *See id.* "Actual notice arises from actual knowledge of an unrecorded interest or infirmity in the grantor's title." *Id.* (internal quotation marks omitted). In turn, constructive notice can include "both (1) record notice 'which results from a record or which is imputed by the recording statutes,' and (2) inquiry notice

---

**10.** The note reflected the original $335,000 advanced by Taylor on June 1, 2006, and the additional $100,000 Taylor loaned on September 5, 2006.

'which is presumed because of the fact that a person has knowledge of certain facts which should impart to him, or lead him to, knowledge of the ultimate fact.'" *Metro West*, 2004 UT 23, ¶ 13, 89 P.3d 155 (quoting *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998)); *see also Haik*, 2011 UT 26, ¶ 14, 254 P.3d 171 ("But inquiry notice does not arise from a record." (internal quotation marks omitted)). To qualify as a bona fide purchaser, Taylor must not have had either actual or constructive notice of the prior unrecorded interest. *See Metro West*, 2004 UT 23, ¶ 13, 89 P.3d 155. Based on the uncontested facts, Taylor had notice of the Bank's equitable interest in the Property when he recorded his 9/6/06 TD.

¶ 37 First, Taylor had constructive notice of the Bank's 6/2/06 TD because it was recorded before he advanced an additional $100,000 and obtained a $435,000 promissory note secured by his 9/6/06 TD. Because recording does not "affect the validity of a document with respect to the parties," *see* Utah Code Ann. § 57-3-102(3) (2010), the Bank's 6/2/06 TD remained ineffective to convey legal title. Nevertheless, the recorded document "impart[ed] notice to all persons of [its] contents." *See id.* § 57-3-102(1). While we agree with Taylor that the "wild" 6/2/06 TD in favor of the Bank "provided no notice of a legal conveyance," its contents, combined with Taylor's knowledge from other sources, alerted Taylor to the fact that the Bank had an unrecorded equitable interest in the Property. *See id.* § 57-4a-2 ("A recorded document imparts notice of its contents regardless of any defect, irregularity, or omission in its execution, attestation, or acknowledgment.").

¶ 38 Taylor knew that the Bank's 6/2/06 TD had been executed by the president of G&L Mac and that G&L Mac was the owner of the Property. Indeed, Taylor made a similar error three months earlier when he obtained his 6/5/06 TD from McDonald personally. Furthermore, both of the promissory notes Taylor obtained from McDonald and Andersen provide that the Bank had the right to be paid from the proceeds of lot sales, thereby implying that the Bank had advanced funds to the developers.[11] Based on this information, Taylor was, at the very least, on inquiry notice that the Bank may have had a prior unrecorded interest in the Property.

¶ 39 Inquiry notice "occur[s] when circumstances arise that should put a reasonable person on guard so as to require further inquiry on his part." *See Meyer v. General Am. Corp.*, 569 P.2d 1094, 1097 (Utah 1977). Where a duty to inquire further arises, the party is deemed to have "notice of everything to which such inquiry might have led." *Johnson v. Higley*, 1999 UT App 278, ¶ 26, 989 P.2d 61 (internal quotation marks omitted). The uncontested affidavits from the Bank indicate that if Taylor had inquired, the Bank would have informed him that it had advanced $1.7 million to McDonald with the understanding that the loan would be secured by a first position trust deed against the Property. Thus, Taylor had notice of the Bank's equitable interest in the property. *See id.* ("A simple telephone call ... could have confirmed or dispelled any question ... and would have led to [the subsequent purchasers] learning of the [prior] conveyance."). We now consider whether Taylor's notice of the Bank's equitable lien is sufficient to defeat Taylor's status as a good faith purchaser for purposes of the recording statute. *See* Utah Code Ann. § 57-3-103.

¶ 40 The question of whether notice of a recorded equitable interest can defeat a subsequent purchaser's status as a good faith purchaser was recently addressed by the Utah Supreme Court in *Haik v. Sandy City*, 2011 UT 26, 254 P.3d 171. There, the parties

---

11. The Bank argues that the promissory notes evidence Taylor's agreement that his lien would be in second position. Although the promissory notes indicate that the proceeds from the sale of lots will be paid first to the Bank, we see nothing in those documents indicating that Taylor agreed to subordinate his trust deed to that of the Bank. *See Jones v. ERA Brokers Consol.*, 2000 UT 61, ¶¶ 13–18, 6 P.3d 1129 (concluding that the agreement, which included a provision that one lender would be paid first from the proceeds of lot sales, did not affect priority in the event of foreclosure). However, the promissory notes do provide evidence that Taylor knew of the Bank's involvement as a lender on the Property.

each claimed ownership of a certain water right.[12] *See id.* ¶ 1. In 1977, Sandy City recorded an "Agreement of Sale" under which it had the right to purchase the water right. *See id.* ¶ 3. Sandy City later obtained a quitclaim deed conveying the water right, but it did not record that document. *See id.* Subsequently, Sandy City's grantor "conveyed 'all of its right, title, and interest' in the water right to [a third party]," Biddulph, who filed an application with the state engineer for a permanent change of water. *See id.* ¶ 5. Although it had notice of the change application, Sandy City did not contest Biddulph's ownership of the water right. *See id.* Through a series of conveyances, Biddulph's water right was conveyed by quitclaim deed to the Haik parties in 2003. *See id.* ¶ 6. The Haik parties' title search performed before purchase did not review records old enough to reveal the 1977 Agreement of Sale by Sandy City. *See id.* ¶ 7. In 2004, the Haik parties filed an application with the Utah Division of Water Rights to change the diversion point of the water right, and Sandy City opposed the application. *See id.* ¶ 8. At that time, Sandy City located and recorded the 1977 deed. *See id.* The Haik parties filed a quiet title action, and both parties moved for summary judgment. *See id.* ¶ 9. The district court entered summary judgment in favor of the Haik parties, holding that they first recorded their deed to the water right and took without notice of Sandy City's unrecorded deed. *See id.* On appeal, Sandy City argued that the recorded Agreement of Sale put the Haik parties on notice, thereby defeating their status as good faith purchasers. *See id.* ¶¶ 11–12.

¶ 41 The supreme court affirmed the decision of the trial court but on somewhat different grounds. *See id.* ¶ 12. First, the court concluded that the recorded Agreement of Sale, even though not located during the title search, "put the Haik Parties on record notice that Sandy City had an equitable interest in the water right." *Id.* ¶¶ 12, 20. Next, the supreme court indicated that "[t]here are circumstances where record notice of an equitable interest in property may subvert a subsequent purchaser's claim of having purchased the same property in good faith." *Id.* ¶ 12.[13] However, the *Haik* court concluded that those circumstances were not present under the facts before it because

(1) the Haik Parties reasonably believed they had a clear and inviolate chain of title to the disputed water right; (2) nearly twenty-seven years had passed since the Agreement of Sale was recorded and Sandy City had still not recorded its deed to the water right; and (3) the Haik Parties' predecessors-in-interest maintained the water right and filed a change application in 1999, yet Sandy City never contested ownership to the water right.

*Id.* ¶ 12. The present facts are easily distinguishable from those in *Haik*.

¶ 42 First, it was not reasonable for Taylor to believe that he had a "clear and inviolate" chain of title to the Property. *See id.* ¶ 12. The Bank's recorded 6/2/06 TD, together with Taylor's other knowledge, alerted him to the fact that the Bank had attempted to secure its loan against the Property, and to the possibility that the Bank might have an interest superior to Taylor's interest. Second, unlike the twenty-seven year delay in *Haik*, it had been only three months since the Bank had recorded its ineffective trust deed. Third, the Bank had not acquiesced in Taylor's claim to a prior interest in the Property, like Sandy City did in *Haik*. We consider these distinctions compelling. While the facts of *Haik* did not support a conclusion that the Haik parties' notice of Sandy City's equitable interest in the water right should

---

12. Like Utah's recording statute, *see* Utah Code Ann. § 57–3–103 (2010), the Utah Water and Irrigation Act is a race-notice statute, *see id.* § 73–1–12 (1989) ("Every deed of a water right which shall not be recorded as provided in this title shall be void as against any subsequent purchaser, in good faith and for a valuable consideration, of the same water right, or any portion thereof, where his own deed shall be first duly recorded.").

13. Later in the opinion, however, the supreme court indicates that it was "[a]ssuming without deciding that there are circumstances under which record notice of an equitable interest in property may subvert a subsequent purchaser's claim to having purchased the property in good faith." *Haik v. Sandy City*, 2011 UT 26, ¶ 22, 254 P.3d 171.

preclude their status as a good faith purchasers, *see id.* ¶ 22, the circumstances here favor the opposite result. Indeed, if knowledge of an equitable interest in real property can ever defeat the good faith status of a subsequently recorded legal interest, it should do so in this case.

¶ 43 Taylor disagrees, arguing that he funded his $335,000 loan to McDonald and Andersen first[14] and, therefore, took his 9/6/06 TD with the knowledge that his equitable interest in the Property was superior to any equitable interest evidenced by the Bank's 6/2/06 TD. Under these circumstances, Taylor contends that his "knowledge" does not defeat his status as a bona fide purchaser. We are not persuaded. First, Taylor loaned an additional $100,000 in September. Irrespective of which equitable lien accrued first in June, Taylor knew that the Bank's equitable interest was superior to any sums later advanced. Second, the supreme court has explained that the "good faith" required by the recording statute means that the subsequent purchaser must take its interest in the property "without notice of a prior, unrecorded interest in the property." *Id.* ¶ 14 (internal quotation marks omitted). Here, Taylor took with notice of the Bank's prior equitable interest despite the fact that the Bank's 6/2/06 TD was invalid. Under the plain language of the recording statute, the Bank's equitable lien is not void as against Taylor's 9/6/06 TD. *See* Utah Code Ann. § 57-3-103 (2010) (providing that prior unrecorded interest "is void as against any subsequent purchaser" for value who records first and purchases in good faith). Thus, when Taylor recorded his 9/6/06 TD he did not affect the existing priority as between himself and the Bank based on the equitable liens that arose in June. Again, that priority must be determined on remand based on the time of accrual, unless the parties agreed otherwise.

## C. The December Warranty Deed Is Subject to the September Trust Deed.

¶ 44 In December 2006, the Bank discovered its failure to record a warranty deed from G&L Mac to McDonald in connection with the June 2006 loan transaction. To remedy this omission, the Bank obtained and filed such a deed in December 2006. At that time, G&L Mac had already conveyed the Property in trust for the benefit of Taylor. As previously discussed, G&L Mac therefore transferred the Property to McDonald subject to Taylor's 9/6/06 TD. *See Utah Farm Prod. Credit Ass'n v. Wasatch Bank of Pleasant Grove,* 734 P.2d 904, 906–07 (Utah 1987) (per curiam). Furthermore, because the Bank recorded the December warranty deed after Taylor recorded his 9/6/06 TD, Taylor's trust deed "takes the [P]roperty over" the subsequently recorded warranty deed. *See Ault v. Holden,* 2002 UT 33, ¶ 31, 44 P.3d 781. In addition, the Bank recorded the warranty deed with notice of Taylor's 6/5/06 TD and the equitable interest it represented. Thus, the December warranty deed did not change the priority of the encumbrances then existing against the Property, a priority that, in the end, depends upon the resolution of the factual issues concerning whether there was an agreement between the lenders as to priority or, if not, the time each lender's equitable lien accrued.

## III. We Are Unable to Affirm the Trial Court's Decision on the Alternative Theory of Reformation.

¶ 45 As an alternative basis for affirming the trial court's summary judgment ruling in its favor, the Bank seeks either to reform its June transaction to include the warranty deed from G&L Mac to McDonald or to reform the date of the December warranty deed to June 2, 2006. Reformation is an equitable remedy that permits the court "to add new terms to a deed or alter the original language of a deed to conform to the parties' intent." *RHN Corp. v. Veibell,* 2004 UT 60, ¶ 41, 96 P.3d 935. Rather than seeking to alter the language of a then-existing document, however, the Bank asks that its June transaction be reformed to create a warranty deed from G&L Mac to McDonald

14. As discussed, we are unable to determine which equitable lien accrued first from the record before us.

that was inadvertently not prepared at the time. The Bank argues that there is no difference between reforming a document to add "words omitted from a piece of paper," and using the reformation doctrine to add the omitted "piece of paper (the deed)." The trial court disagreed, concluding that such relief is beyond the scope of the reformation doctrine because, rather than correcting an error in an existing document, it seeks to create an entirely new document. The Bank asks us to reach the opposite conclusion and to affirm the summary judgment in its favor based on the reformation of the June transaction to include a warranty deed from G&L Mac to McDonald, which in turn would validate the Bank's 6/2/06 TD.

¶ 46 We have found no Utah cases applying the reformation doctrine so expansively, and the Bank has not pointed us to any. However, the Georgia Court of Appeals recently considered a similar situation in *DeGolyer v. Green Tree Servicing, LLC*, 291 Ga. App. 444, 662 S.E.2d 141 (2008). There, Two Eagles, Inc., a company owned by the DeGolyers, purchased certain real property with a loan secured by a security deed on the property (first loan). *See id.* at 144–45. Approximately one year later, the DeGolyers sought to refinance the loan with Conseco. *See id.* at 145. Although the property was owned by Two Eagles, Conseco assumed that the company would convey title to the DeGolyers as part of the transaction. *See id.* Consequently, the security deed and all other loan documents "were signed by the DeGolyers as individuals and not in their capacity as officers of Two Eagles." *Id.* As part of the loan closing, the first loan was paid and the corresponding security deed cancelled. *See id.* Inadvertently, however, no deed transferring the property from Two Eagles to the DeGolyers was prepared, executed, or recorded. *See id.* Thereafter, Conseco's interest was acquired by Green Tree Servicing. *See id.* The DeGolyers defaulted on the loan, and Green Tree began foreclosure proceedings, eventually discovering that title to the property had never been conveyed to the DeGolyers. *See id.* When the DeGolyers refused to cooperate in providing the required deed, the trial court granted Green Tree's motion to reform the security deed by requiring

them to do so. *See id.* On appeal, the Georgia Court of Appeals affirmed, stating,

> Here, it is undisputed that both the DeGolyers and Green Tree intended for the [property] to be the subject of the security deed and the collateral for the Green Tree loan. Thus, the failure to have Two Eagles either convey the tract to the DeGolyers, or be included as a signatory on the loan documents ... constituted a mutual mistake that was relievable in equity.

*Id.* at 146; *see also Flaherty v. Broadway Assocs. Ltd. P'ship*, 171 A.D.2d 938, 566 N.Y.S.2d 982, 982 (1991) (holding that a deed executed by parties in their individual capacities, rather than as principles of company holding title, could be reformed "as to the proper name of the grantor or the proper capacity of [the individuals]"). Because the transfer from Two Eagles to the DeGolyers, individually, was intended by both of the parties to the transaction, and the DeGolyers would not suffer any prejudice as a result of the reformation, the Georgia Court of Appeals held that reformation was appropriate. *See DeGolyer*, 662 S.E.2d at 146.

¶ 47 Assuming without deciding that a similar approach is possible here, we agree with Taylor that the Bank has not met its burden of establishing its right to this relief. Reformation is appropriate

> "where the terms of the written instrument are mistaken in that they do not show the true intent of the agreement between the parties. There are two grounds for reformation of such an agreement: mutual mistake of the parties and ignorance or mistake by one party, coupled with fraud by the other party."

*See RHN Corp.*, 2004 UT 60, ¶ 36, 96 P.3d 935 (quoting *Hottinger v. Jensen*, 684 P.2d 1271, 1273 (Utah 1984)). In turn, a " '[m]utual mistake of fact may be defined as error in reducing the concurring intentions of the parties to writing.' " *Id.* ¶ 37 (quoting *Naisbitt v. Hodges*, 6 Utah 2d 116, 307 P.2d 620, 623 (1957)). The Bank has "the burden of proving by clear and convincing evidence that there was a mutual mistake of fact." *See Hatch v. Bastian*, 567 P.2d 1100, 1102 (Utah 1977).

¶ 48 The Bank contends that the concurring intentions of the parties to its June loan transaction were that a warranty deed would be executed conveying the Property from G&L Mac to McDonald. In support of that position, the Bank has provided affidavit testimony evidencing that both it and Mountain View Title intended that a warranty deed would be executed by G&L Mac conveying the Property to McDonald in his individual capacity as part of the June loan transaction. As Taylor correctly indicates, however, the record is silent on whether McDonald also intended that the Property would be conveyed to him from G&L Mac at that time. Without evidence that both parties' intentions were mistakenly not reduced to writing, we are unable to determine whether reformation is appropriate. *See Peterson v. Coca–Cola USA*, 2002 UT 42, ¶ 20, 48 P.3d 941 (holding that the claim of mutual mistake failed because the proponent did not provide evidence of the intent of the other party to the release and that party's insurance carrier); *Cantamar, LLC v. Champagne*, 2006 UT App 321, ¶ 39, 142 P.3d 140 (refusing to reform a promissory note to refer to an oral agreement because the party claiming reformation had not provided any evidence that the other party to the note shared that intention); *see also Davis v. Mulholland*, 25 Utah 2d 56, 475 P.2d 834, 835 (1970) ("[A] contract will not be reformed for a unilateral mistake.").

¶ 49 Furthermore, reformation cannot take effect retroactively if it will result in prejudice to an innocent party.

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, *except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.*

Restatement (Second) of Contracts § 155 (1981) (emphasis added); *see also Grahn v. Gregory*, 800 P.2d 320, 325 (Utah Ct.App. 1990) (following Restatement (Second) of Contracts § 155 (1981)).

¶ 50 Taylor claims that he had no knowledge of any prior interest when he advanced the first $335,000 to McDonald and Andersen in June 2006. Indeed, Taylor testified that Andersen and McDonald assured him that the corresponding promissory note would be secured by a first position trust deed against the Property. Thus, for purposes of summary judgment, we assume that when Taylor advanced the $335,000 that created his equitable interest in the Property, he did so in good faith. If Taylor is correct that his equitable lien accrued before the equitable lien created by the Bank's $1.7 million lien, and the parties did not agree otherwise, Taylor has the right to be paid first from the proceeds at foreclosure.

¶ 51 If, however, the June loan transaction is reformed retroactively to include a warranty deed from G&L Mac to McDonald, the Bank's 6/2/06 TD would become effective when recorded. There is no evidence before us that the Bank had notice of Taylor's equitable lien at that time. As a result, the Bank may be in first position even if Taylor's equitable lien accrued first and without any intent that it be subordinated to the Bank's interest. Then, if the proceeds from foreclosure were not sufficient to satisfy both lenders, Taylor would be prejudiced. Even if we agreed that reformation can be used to create the missing warranty deed, it cannot be imposed retroactively if it would "unfairly affect" the right of an innocent third party. *See Grahn*, 800 P.2d at 325. Therefore, because there are disputed issues of material fact on the issue of prejudice, summary judgment is not appropriate under the Bank's alternative theory of reformation.

## CONCLUSION

¶ 52 The after-acquired title statute operates to convey interests in property but does not supplant the recording statute for purposes of determining the priority of competing interests in real property. Any conveyance of after-acquired title pursuant to the statute is transferred in the condition it exists at the time that title is acquired by the formerly titleless grantor. Consequently, when G&L Mac conveyed the Property to McDonald in December 2006, it was encumbered by Taylor's 9/6/06 TD. The priority of

the interests in the property are governed by Utah's race-notice principles. Both Taylor and the Bank advanced funds to McDonald in June 2006 with the understanding that the loans would be secured by trust deeds on the property. Although the Bank's 6/2/06 TD and Taylor's 6/5/06 TD were ineffective to convey the property in trust, they provided record notice of their contents. Because Taylor took with notice of the Bank's prior unrecorded equitable lien, the Bank's equitable interest is not void as against Taylor's 9/6/06 TD. As a result, the interests of the parties are dependent upon the order in which the June 2006 equitable liens accrued, unless the parties intended otherwise. Because there are material issues of fact concerning the intent of the parties and the order and amount of the equitable liens, we reverse the summary judgment in favor of the Bank and remand for further proceedings in the trial court.

¶ 53 In addition, we affirm the trial court's denial of summary judgment for the Bank on the alternate theory of reformation. First, there is no evidence in the record as to McDonald's intent concerning the June 2006 loan transaction. Second, there are issues of material fact as to whether retroactive reformation will prejudice Taylor.

¶ 54 Reversed and remanded.

¶ 55 WE CONCUR: STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN, Judges.